**UNITED STATES of America, Appellee,**

v.

**Timothy Edward GRAHAM, Appellant.**

**No. 94–2058.**

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 11, 1994.

Decided July 14, 1995.

Scott Tilsen, Federal Public Defender, Minneapolis, MN, argued (Virginia Villa, Federal Public Defender, on the brief), for appellant.

Margaret Burns Magill, Asst. U.S. Atty., Minneapolis, MN, argued, for appellee.

Before McMILLIAN, Circuit Judge, McKAY,* Senior Circuit Judge, and BOWMAN, Circuit Judge.

McMILLIAN, Circuit Judge.

Timothy Edward Graham appeals from a final judgment entered in the District Court for the District of Minnesota, upon a jury verdict, finding him guilty of two counts of making a false statement, in violation of 18 U.S.C. § 152. The district court sentenced Graham to 30 months imprisonment, three years of supervised release, and a special assessment of $100.00. For reversal, Graham argues that the district court erred in denying his motion to dismiss as multiplicitous two of the three counts of making a false statement. He also argues that the district court erred in assessing his criminal history category, in calculating the amount of loss, and in enhancing his sentence for use of a special skill to facilitate his offense. For the reasons discussed below, we reverse the

\* The Honorable Monroe G. McKay, Senior United States Circuit Judge for the Tenth Circuit, sitting

convictions and remand the case to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND

Graham's conviction stems from a simple scheme to hide an asset to prevent its inclusion in his bankruptcy estate. In November 1991, Graham, a trust and estate attorney, filed a personal bankruptcy petition under Chapter 11. In the bankruptcy petition, Graham was required to list all of his assets. Graham owned an undivided one-half interest in a series of apartment buildings referred to as Megra Properties which he did not include on schedule A (ownership of property) or schedule B (partnership interest). However, on schedule D of the petition, which lists creditors with secured claims, Graham listed a $50,000 debt to a Florida law firm and attached a description of Megra Properties as collateral for that debt. Graham also included a form entitled Individual Debtor's Statement of Intention in which he described Megra Properties and indicated that he would surrender his interest in the property to the law firm, but did not disclose the nature of his ownership interest.

At the first meeting of creditors in January 1992, Graham stated under oath that he did not list his ownership interest in Megra Properties on his schedule of assets because he had transferred that interest to a trust he created for his minor son, the Brian James Morehouse Irrevocable Trust. He stated that the transfer of the property to the Trust occurred on December 28, 1989.

In February 1992, Graham filed an amended Individual Debtor's Statement of Intention on which he did not list Megra Properties. Graham's Chapter 11 bankruptcy was converted to a Chapter 7 bankruptcy and a trustee was appointed. After the conversion, the creditors held a second meeting where, in response to questioning by the United States Trustee, Graham stated under oath that he did not list his ownership interest in Megra Properties because he had transferred that

by designation.

interest to the Brian James Morehouse Irrevocable Trust on December 28, 1989.

During the third creditors' meeting, on November 6, 1992, Graham repeated his statement explaining his failure to list Megra Properties as an asset in response to questioning by counsel for one of the creditors. Graham also stated that he had prepared the trust document, appointed himself trustee, and that the trust was executed and verified by witnesses, on December 28, 1989. He further stated that, although the trust document was notarized, it was not notarized on the date of execution, and the person who later notarized the trust document was present when the document was executed but was not a registered notary on that date.

Graham was charged in an indictment with one count of concealment of assets (Count I) and three counts of making a false statement (Counts II–IV). Evidence presented at trial proved that the trust document could not have been created in 1989 because a watermark in the paper on which the trust document was written established that the paper was not manufactured until 1991. In addition, the notary testified that he did not witness Graham's signing of the trust document nor did he notarize the document until the spring or fall of 1991. The jury found Graham guilty of making two false statements (Counts III and IV) but did not reach a verdict on the concealment of assets (Count I) and one count of making a false statement (Count II). The district court sentenced Graham to a total term of 30 months imprisonment, to be followed by three years of supervised release. This appeal followed.

## II. DISCUSSION

### MULTIPLICITOUS COUNTS

■ Graham first argues that the district court erred in denying his motion to dismiss two of the three counts of making a false statement because they were multiplicitous and therefore in violation of the Double Jeopardy Clause. Graham argues that he should not have been charged with three separate

violations of 18 U.S.C. § 152 because he made the three statements to the same people in response to the same questions. In support of this contention he cites *United States v. Trent*, 949 F.2d 998 (8th Cir.1991), *cert. denied*, 505 U.S. 1209, 112 S.Ct. 3005, 120 L.Ed.2d 880 (1992), and *United States v. Olsowy*, 836 F.2d 439 (9th Cir.1987) *cert. denied*, 485 U.S. 991, 108 S.Ct. 1299, 99 L.Ed.2d 509 (1988). The government contends that the three false statements occurred on separate occasions during different portions of the bankruptcy proceeding and were made to three different people. Therefore, the government argues that each statement was charged properly as a separate count. The government contends that *United States v. Feldhacker*, 849 F.2d 293 (8th Cir.1988), is more closely analogous to the facts of the present case and should be controlling.

In *Olsowy* the Ninth Circuit held that multiple convictions under 18 U.S.C. § 1001[1] may not be based upon the same false statement made to the same secret service agent. In *United States v. Salas–Camacho*, 859 F.2d 788 (9th Cir.1988), the Ninth Circuit distinguished *Olsowy* by holding that identical false statements made to different government agents could each be prosecuted separately if the repetition of the statement constituted an additional impairment of the operations of the government. *Id.* at 791. In *Salas–Camacho*, the second statement was made to a secondary customs inspector whose duties were different from the primary customs inspector to whom the false statement was initially made. In *Trent* this court held that the rationale of *Olsowy* was applicable where the same false statement was made by a bank teller to two FBI agents investigating a false report of a robbery, one of whom was present during both interviews, because the second statement "added nothing to the harm caused to the FBI's inquiry." 949 F.2d at 1000 (citing *Olsowy*, 836 F.2d at 443).

1. For purposes of this discussion § 1001 and § 152 false statements are synonymous. A false statement made in support of claims or matters within the jurisdiction of any department or agency of the United States violates 18 U.S.C. § 1001. Similarly, a false statement made in relation to any case filed in a Title 11 bankruptcy proceeding violates 18 U.S.C. § 152.

■ We conclude that the rationale of *Trent, Olsowy* and *Salas–Camacho* merge to create a unitary harm rule whereby repetition of a false statement which does not "constitute an additional impairment of ... governmental functions," *Salas–Camacho,* 859 F.2d at 791, should not be charged separately in an indictment. The statements made by Graham at all three creditors' meetings were practically identical. Although the statement was made to three different individuals—the United States Trustee and two attorneys representing creditors—those individuals conducting the inquiries were acting in the same role with the same objective: to ascertain all assets that should have been included in the bankruptcy estate. Graham misled the creditors at the first creditors' meeting. His repetition of the same statement at the second and third creditors' meetings added nothing further to harm the bankruptcy action; the harm was done from the outset.

■ *Feldhacker* supports this conclusion. In *Feldhacker,* this court held that "separate false statements may be charged in separate perjury counts if they require different factual proof of their falsehood, notwithstanding their relationship to a common nexus of fact." 849 F.2d at 297 (citation omitted). In applying this principle, Graham's indictment on three counts for making the same three statements is impermissibly multiplicitous. Graham's false statement was that he had properly transferred his ownership interest in Megra Properties to a trust for his son in 1989. Once the government proved that the first statement was false, the same factual proof of the falsehood applied to the two subsequent statements as well. Therefore, we hold that the district court erred in denying the motion to dismiss two of the three counts of making a false statement as multiplicitous.

## CRIMINAL HISTORY CALCULATION

■ Although Graham's convictions are reversed and this case remanded for resentencing, the sentencing issues are likely to arise on remand and we therefore will discuss them now to provide direction to the district court.

Graham argues that the district court improperly calculated his criminal history category. In the presentence report, the probation officer included one point for a misdemeanor conviction on October 22, 1992, and two points because the false statement in Count IV was committed on November 6, 1992, while he was on probation for a misdemeanor offense, which placed Graham in criminal history category II based upon the three criminal history points. Graham properly objected to his criminal history calculation. He argues that if he is successful on his claim that the three charges of making a false statement in the indictment is multiplicitous, then Count IV should be dismissed and therefore the two criminal history points based on that count are improper.

The government argues that if this court holds that Graham was convicted on multiplicitous counts, the proper remedy is to remand to the district court for resentencing and, after remand, allow the United States to elect which count to dismiss. We agree. The proper course is to remand this case for resentencing and direct the government to elect the false statement count that it wishes to leave in effect. *See, e.g., United States v. Saks,* 964 F.2d 1514, 1526 (5th Cir.1992); *United States v. Moody,* 923 F.2d 341, 347–48 (5th Cir.1991).

## AMOUNT OF LOSS

■ Graham next argues that the district court incorrectly calculated the amount of loss. The district court determined that the amount of loss was $100,000, which represents Graham's one-half interest in Megra Properties which had a net equity of $200,000. Because the amount of loss was more than $70,000, the base offense level is increased by six levels. U.S.S.G. § 2F1.1(b)(1)(G). We review a district court's finding regarding the amount of loss under U.S.S.G. § 2F1.1 under the clearly erroneous standard. *United States v. Earles,* 955 F.2d 1175, 1180 (8th Cir.1992).

■ Section 2F1.1 provides that the offense level for offenses involving fraud or deceit may be increased based upon the amount of loss. The amount of loss is determined by the amount of loss the defendant

intended to inflict or the actual loss resulting from the fraudulent conduct. *United States v. Edgar*, 971 F.2d 89, 93 (8th Cir.1992). Graham was not successful in divesting the bankruptcy estate of Megra Properties; therefore, the district court properly focused upon the amount of loss Graham intended to inflict. *Kok v. United States*, 17 F.3d 247, 250 (8th Cir.1994). The district court accepted the presentence report estimate that the gross value of Megra Properties was $399,500, which was based upon a listing agreement[2] to sell Megra Properties. This amount was reduced by $200,000 to reflect the net equity of the property. The district court attributed one-half of the net equity of the property, or $100,000, to Graham as the value of his one-half interest in the property. Because this amount fell within the applicable guideline range of $70,000 to $120,000, Graham's offense level was increased by six levels. U.S.S.G. § 2F1.1(b)(1)(G).

Graham argues that the district court should have further reduced the value of the property by the value of the $55,000 lien recorded against the property. Graham failed to properly record the trust interest before the lien was filed. Therefore, he argues that because the lien would stand even if the trust had existed, the amount of loss should be reduced by $55,000 because the lien reduced his expected gain and intended loss. The district court found that Graham "intended the bankruptcy estate to lose the full value of the property ..." *Sentencing Memorandum* at 8. We agree with the district court's calculation. Evidence was presented at trial that, had the trust instrument been accepted by the bankruptcy court, the lien holder would have become a bankruptcy creditor and would have been subject to the bankruptcy distribution. As a result, Graham would have been able to retain the full value of his one-half interest in the property. The fact that his scheme was flawed does not persuade us that he intended for the bankruptcy estate to lose any less than the amount he stood to gain had his deception been better executed.

## USE OF A SPECIAL SKILL

■■■ Graham next argues that the district court erred in increasing his offense level by two points for using a special skill in committing his offense. The district court found that Graham "drew on his skills as a trust and estate lawyer to create a fraudulent trust document to remove his only asset from the bankruptcy estate." *Sentencing Memorandum* at 11. The district court found that Graham's "skills as a lawyer also came into play in establishing the fraudulent date the trust was created." *Id.* We review the district court's finding that the defendant used special skills for clear error. *United States v. Brelsford*, 982 F.2d 269, 273 (8th Cir.1992). An enhancement is proper if the defendant "used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Application Note 2 to that section explains that "[s]pecial skill' refers to skill not possessed by members of the general public and usually requiring substantial education, training of licensing. Examples would include pilots, lawyers, doctors, accountants, chemists and demolition experts." U.S.S.G. 3B1.3, application note 2 (emphasis added).

Graham does not dispute that he is a lawyer or that he possess a special skill. He does argue, however, that his special skill did not facilitate the commission of the offense because making a false statement did not require a special skill. A similar argument

2. Graham also argues that the district court erroneously accepted the figure of $399,500 based on a listing agreement as the value of the property. Graham suggests that the evidence at trial proved that the listing price exceeded the true value of the property and therefore the tax valuation of the property of $319,000 should be considered in arriving at a reasonable value of the property. Accordingly, Graham further suggests that the court assess the value of the property based on all the evidence which would be approximately $350,000, an amount between the listing agreement price and the tax valuation.

We need not decide this issue. Even if we assume for purposes of discussion that the district court should have used $350,000 to begin calculating the amount of loss, that error would be harmless because we reject Graham's argument that he is entitled to a further reduction of $55,000 for the lien against the property. The $350,000 would be reduced by the $200,000 contract of deed on the property resulting in a value of his one-half interest of $75,000, which is still within the applicable guideline range which subjected him to the six level increase.

was rejected in *United States v. Culver,* 929 F.2d 389 (8th Cir.1991), where the defendant was convicted of conspiracy to transport a stolen vehicle. The defendant, a pilot, objected to an enhancement for use of a special skill, arguing that because he was arrested before he flew the plane, his special skill was never directly used in the crime for which he was convicted. The court rejected the argument that the special skill had to be directly related to the offense of conviction and stated that "his skills were required to plan for fuel, devise flight paths, and to prepare the aircraft for flight after the undercover agent left." *Id.* at 393. Similarly, in the present case, the fact that Graham was familiar with trust instruments and the use of trusts to exclude trust property from the bankruptcy estate belies his claim that he did not use his special skill as a lawyer to facilitate the commission of the offense.[3] *See, e.g., United States v. Harris,* 38 F.3d 95, 99 (2nd Cir. 1994), *United States v. White,* 1 F.3d 13, 18 (D.C.Cir.1993). We conclude that the district court did not err in finding that Graham used his special skills as a lawyer to facilitate the commission of his crime.

## CONCLUSION

Accordingly, Graham's convictions are reversed and vacated. This case is remanded to the district court with directions to order the government to elect which § 152 count of conviction it wishes to leave in effect, after which the district court must resentence the defendant.

3. Although, under these facts, Graham's status as a lawyer sufficed in itself to justify the enhancement, we find it worth noting that Graham's skill was highly specialized in that he was a trust and estate lawyer. His expertise in trust and estate matters was instrumental to his crime in this case: he made a § 152 false statement by forging a trust document. Ordinary members of the legal community not versed in trust and estate matters would not be as capable of creating such a document or understanding the advantage of veiling its inclusion in a bankruptcy estate. We can not think of a better scenario to support a special skill enhancement.