### UNITED STATES of America

v.

### William H. ANDERSON
### No. CR.02–10102–MLW.

United States District Court, D. Massachusetts.

Oct. 23, 2002.

---

19. See footnote number two.

Stephen G. Huggard, U.S. Attorney's Office, Washington, DC, for Plaintiff.

Michael A. Collora, Dwyer & Collora, Daniel M. Rabinovitz, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

WOLF, District Judge.

The court recently received and read the Presentence Report ("PSR") concerning William H. Anderson in anticipation of his sentencing, which was scheduled for October 17, 2002. Neither party objected to any part of the PSR that relates to the calculation of the guideline range or possible sentence. However, the court questions whether Probation and the parties have properly calculated the guideline range for Anderson's sentence. In addition, the PSR does not include the information which the court provided to Probation and the parties on June 20, 2002 concerning factors that might warrant an upward departure in this case. *Compare* PSR ¶ 108 *with* June 20, 2002 Transcript ("Tr.") at 16–21. The October 17, 2002 sentencing hearing was cancelled so the court could give Probation and the parties fair notice of its concerns and an opportunity to address them prior to the sentencing hearing.

The court's questions and concerns are rooted in the following, apparent facts. On July 23, 2001, Gary Sampson called the Boston office of the Federal Bureau of Investigation ("FBI"). He spoke to Anderson, an employee of the FBI who was answering the telephones. Sampson claims that he said that he was a fugitive wanted for several bank robberies, was in Abington, Massachusetts, and requested that the FBI arrest him. Anderson disconnected the call.[1] Sampson did not call back. Although he was reportedly seen waiting in Abington for several hours on July 23, 2001, the FBI did not come to take him into custody.

The next day, Sampson allegedly murdered two people in Massachusetts and stole their cars. After driving to New Hampshire, he allegedly murdered another person.

After being apprehended on July 31, 2001, Sampson reportedly confessed to committing the murders and told investigators about his July 23, 2001 call to the FBI. The FBI became involved in the case because state law does not authorize the death penalty for crimes committed in Massachusetts and the crime committed in New Hampshire might not be subject to that state's death penalty. However, federal law authorizes the death penalty for a car-jacking which results in death. *See* 18 U.S.C. § 2119.

It was widely reported that the FBI was investigating the car-jacking and murders as potential death penalty cases. Sampson's claim to have called the FBI before committing the three murders was publicly linked to the possibility that federal charges implicating the death penalty would be brought. For example, the August 2, 2001 *Boston Herald* (Exhibit A hereto) reported, in part, that:

> Gail Marcinkiewicz, a spokeswoman for the FBI in Boston, said the probe "to date" has found no evidence the accused

---

1. It is not clear whether the call was disconnected inadvertently as Anderson asserts. The government states that it has no evidence or "rational basis" for believing that Sampson was not disconnected inadvertently. Government's Sentencing Brief at 3. However, the government evidently has not provided Probation with the polygraph questions to which Anderson tested "deceptive" on December 12, 2001. That information may be relevant to this issue.

triple-murderer—who could ultimately face the death penalty—made the call July 24[sic] from an Abington pay phone as he claimed, but it will be several days before the investigation is completed.

In view of the extensive media coverage, a reasonable person would have realized in early August 2001 that the question of whether Sampson had called the FBI was relevant to whether he would be subject to the death penalty and ultimately executed.

Prior to October 30, 2001, Anderson, among others, was asked by an FBI official whether he had received a telephone call like that described by Sampson. Anderson denied receiving any such call. *See* Government's Sentencing Brief at 3. The PSR does not address whether this denial constituted an intentional false statement in violation of 18 U.S.C. § 1001 or, if it was made under oath, constituted perjury in violation of 18 U.S.C. § 1621.

In any event, the FBI's investigation of the alleged telephone call continued. The nature of that investigation is not described in the PSR. However, on September 15, 2001, *The Boston Globe* (Exhibit B hereto) reported that: "The FBI yesterday issued a statement confirming that Gary Sampson placed a telephone call to the Boston office of the bureau the day before he allegedly went on a rampage that left three people dead."

On October 30, 2001, Anderson was questioned under oath by Department of Justice investigators. *See* Defendant's

Sentencing Memorandum at 4. As a result of that questioning, Anderson gave the investigators a sworn affidavit. *Id.* In that affidavit he again intentionally and falsely stated that he had not received a telephone call on July 23, 2001 from an individual wanting to surrender to the FBI. *Id.;* PSR ¶ 9; June 20, 2002 Tr. at 13–15.

The investigation relating to the alleged telephone call continued after October 30, 2001. Once again, it is not clear from the PSR what that investigation involved.

On December 12, 2001, Anderson was given a polygraph examination. The PSR does not indicate whether he was questioned under oath. Anderson again denied receiving a telephone call such as that described by Sampson. After being informed that his answers to the multiple questions were deceptive, Anderson admitted that he had received the call in question and that his October 30, 2001 affidavit was false. *See* Government's Sentencing Brief at 3–4.

On June 20, 2002, Anderson waived indictment and, purportedly without any agreement with the government, pled guilty to a one-count information charging him with making a false statement on October 30, 2001, in violation of 18 U.S.C. § 1001. Although that false statement was made in a sworn affidavit, Anderson was not charged with perjury in violation of 18 U.S.C. § 1621.[2] Nor was Anderson charged with obstructing justice in violation of 18 U.S.C. § 1512(b)(3). In addition,

---

**2.** The U.S. Attorneys' Manual provides, in pertinent part, that:

> Except as provided in USAM 9–27.330, (precharge plea agreements), once the decision to prosecute has been made, the attorney for the government should charge, or should recommend that the grand jury charge, the most serious offense that is consistent with the nature of the defendant's conduct, and that is likely to result in a sustainable conviction.

U.S. Dep't of Justice, United States Attorneys' Manual § 9–27.300 (2000). The fact that Anderson was charged with violating § 1001 rather than § 1621, which, as discussed *infra*, would have generated a higher guideline range, raises the question whether this case involves a precharge plea agreement that was not disclosed to the court at the June 20, 2002 hearing or otherwise.

Anderson was not charged with any crime based upon the statement(s) he made to the FBI prior to October 30, 2001 concerning Sampson's telephone call or based upon his false statements to the polygraph examiner on December 12, 2001.

At the June 20, 2002 hearing, Anderson acknowledged that he understood that acting intentionally was an element of a § 1001 offense and admitted that he knew that his October 30, 2001 affidavit was false when he gave it to the Department of Justice investigators. *See* June 20, 2002 Tr. at 11–15. However, on June 21, 2002, *The Boston Globe* (Exhibit C hereto) reported that: " 'I really didn't recall to be honest with you,' Anderson told reporters after pleading guilty, insisting that his memory about the call wasn't jogged until he flunked a polygraph examination last December."

At the June 20, 2002 hearing the court stated that if the guideline range for Anderson's sentence was zero to six months as the parties predicted, there would be a substantial question as to whether an upward departure would be appropriate. June 20, 2002 Tr. at 18. As possible grounds for such a departure, the court noted that the false statement was made more than once, was not corrected until Anderson was informed that he had failed the polygraph examination, and would be relevant to a jury's decision whether to sentence Sampson to death. *Id.* at 18–21. As indicated earlier, the PSR does not reiterate this notice of these possible grounds for an upward departure. *See* PSR ¶ 108.

At the June 20, 2002 hearing the court also informed the parties that it had a question whether the Guideline range for Anderson's sentence would be higher if he had been charged with making a false statement to the polygraph examiner on December 12, 2001, after the November 1,

2001 amendments became effective. *Id.* at 16–17. In addition, the court raised the issue of whether the false statements that were not charged as crimes in the Information nevertheless constituted Relevant Conduct pursuant to U.S.S.G. § 1B1.3 and, if so, whether the guideline range would be altered. *Id.* at 17–18. These questions are not addressed in the PSR.

Accordingly, there are a number of issues that have not been addressed, or addressed adequately, in the PSR and memoranda of the parties. They include the following.

■ "Barring any *ex post facto* problem, a defendant is to be punished according to the guidelines in effect at the time of sentencing." *United States v. Harotunian,* 920 F.2d 1040, 1041–42 (1st Cir.1990). The current guidelines became effective November 1, 2001.

The date of the offense of conviction in this case is October 30, 2001. Even assuming that Anderson's false statements to the polygraph examiner constitute Relevant Conduct, the date of conviction for *Ex Post Facto* Clause purposes is not altered. *See United States v. Smith,* 46 F.3d 1223, 1239 (1st Cir.1995); *United States v. Bennett,* 37 F.3d 687, 699 (1st Cir.1994); U.S.S.G. § 1B1.11, A.N.2. Therefore, the offense of conviction in this case was committed before the current guidelines came into effect. Thus, the court must decide if there is an *Ex Post Facto* Clause impediment to employing the current guidelines at sentencing.

■ The PSR is inconsistent on the issue of whether the November 1, 2000 Manual, which was in effect on October 30, 2001, or the current Manual, which became effective the next day, should be employed. Paragraph 19 states that "the most beneficial calculation results from the guidelines in effect at the time of the commission of

the offense." PSR ¶ 19. However, paragraph 40 states that "[s]ince both calculations result in the same total offense level, the Probation Office is applying the 2001 edition of the Guideline Manual." PSR ¶ 40. The question of which Manual to apply must be resolved.

Moreover, the court questions whether Probation and the parties are correct in their conclusion that the Base Offense Level is 6 and the Total Offense Level is 4 under either Manual. *Id.*

With regard to the November 1, 2000 Manual, Probation properly began by focusing on U.S.S.G. § 2F1.1(a), which has a Base Offense Level of 6. However, Probation evidently overlooked Application Note 14 to that section, which states in pertinent part that:

> Sometimes, offenses involving fraudulent statements are prosecuted under 18 U.S.C. § 1001, or a similarly general statute, although the offense is covered by a more specific statute. . . . . Where the indictment or information setting forth the count of conviction (or a stipulation as described in § 1B1.2(a)) establishes an offense more aptly covered by another guideline, apply that guideline rather than § 2F1.1. Otherwise, in such cases, § 2F1.1 is to be applied, but a departure from the guidelines may be considered.

U.S.S.G. § 2F1.1, A.N. 14 (Nov. 1, 2000 Manual).

It is not disputed that on October 30, 2001 Anderson intentionally made the false, material statement with which he was charged under oath. *See* June 20,

2002 Tr. at 13–15; Defendant's Sentencing Memorandum at 4. Thus, it appears that he acknowledges that he committed perjury. *See United States v. D'Andrea*, 107 F.3d 949, 958 (1st Cir.1997); *cf. United States v. Dubon–Otero*, 292 F.3d 1, 16–17 (1st Cir.2002) (perjury before grand jury). The PSR should reflect this. At least under the guidelines in effect at the time of the offense, facts in the PSR that are not disputed may be taken into account in determining whether another guideline section more aptly covers the offense that was committed. *See United States v. Scungio*, 255 F.3d 11, 13 n. 1, 16–19 (1st Cir.2001).

Accordingly, it appears that, under the Manual in effect at the time of the offense, § 2J1.3, which covers perjury, should be employed to calculate the guideline range for Anderson's sentence.[3] Section 2J1.3(a) establishes a Base Offense Level of 12. Section 2J1.3(b) provides for an additional three-level enhancement if the perjury "resulted in substantial interference with the administration of justice." A "substantial interference with the administration of justice" includes causing "the unnecessary expenditure of substantial governmental resources." The details of the government's investigation after October 30, 2001 are relevant to the question of whether this adjustment is applicable in this case, but are not addressed in the PSR.

■ Similar issues exist under the current Manual. The Amendments effective November 1, 2001 moved § 1001 offenses to U.S.S.G. § 2B1.1, *Fraud and Deceit.* Section 2B1.1(c)(3)(C) now provides that if,

---

**3.** It appears that it would also have been permissible for Anderson to have been charged with obstruction of justice pursuant to 18 U.S.C. § 1512(b)(3). *See United States v. Veal*, 153 F.3d 1233, 1246 (11th Cir.1998); *United States v. Smith*, No. 00 CR 785–1, 2001 WL 1568851 (N.D.Ill. Dec. 10, 2001). There-

fore, U.S.S.G. § 2J1.2 may also be a more apt provision to apply than § 2F1.1(a). However, as § 2J1.2 and the perjury section which follows it, § 2J1.3, are in pertinent part identical, the court has focused on the latter because it seems to most accurately cover Anderson's conduct.

in the circumstances of this case, "the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct), apply that other guideline." Application Note 11 explains that this provision is intended to apply in § 1001 cases in which the count of conviction "establishes an offense more aptly covered by another guideline." U.S.S.G. § 2B1.1, A.N. 11. If, as this suggests, the transfer of § 1001 offenses to § 2B1.1 was not intended to effect any substantive change in the guidelines, *Scungio* provides precedent for applying the perjury guideline, § 2J1.3, of the current Manual, which was not altered by the November 1, 2001 Amendments.

If, however, the November 1, 2000 Manual requires using § 2J1.3, but the current Manual does not, the current Manual appears more advantageous to Anderson and should be used. However, as set forth below, the court believes that if it is not already accounted for in the applicable guideline, the fact that Anderson's false statement was made under oath and, therefore, constitutes perjury is a factor that would favor an upward departure. *See* U.S.S.G. § 5K2.21.[4]

■ The court also questions whether Anderson should receive a two-level reduction for Acceptance of Responsibility under § 3E1.1. "A defendant who enters a plea of guilty is not entitled to an adjustment [for acceptance of responsibility] as a matter of right." U.S.S.G. § 3E1.1, A.N. 3; *see also United States v. Walker*, 234 F.3d 780, 784 (1st Cir.2000). Rather, the influence of a guilty plea on this issue "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1, A.N.3. If Anderson was accurately quoted as denying that he recalled receiving Sampson's telephone call when he provided his affidavit on October 30, 2001, it appears that he promptly and publicly proclaimed that he had not committed the § 1001 offense to which he had just pled guilty. Therefore, the issue of whether he should receive credit for acceptance of responsibility should be addressed further in the PSR.

■ In addition, the fact that Anderson made false statements on three occasions to different government officials who appear to have been performing related but different functions suggests that the uncharged false statements may constitute Relevant Conduct pursuant to § 1B1.3. *Compare United States v. Salas–Camacho*, 859 F.2d 788, 790–91 (9th Cir.1988) *with United States v. Graham*, 60 F.3d 463, 466–67 (8th Cir.1995). As indicated earlier, the court raised this question at the June 20, 2002 hearing. *See* June 20, 2002 Tr. at 17–18. However, the PSR does not address whether there is any Relevant Conduct and, if so, whether the guideline range is altered.

In addition, regardless of whether Anderson's Total Offense Level is calculated pursuant to the guideline provision generally applicable to § 1001 offenses or the provision that applies to perjury, the court will continue to consider whether an upward departure is permissible and appropriate under § 5K2.0. The combination of factors on which such a departure might be based include the following.

Anderson made false statements on three occasions, over a more than four

---

4. Section 5K2.21 provides, in pertinent part, that, "[t]he court may increase the sentence above the guideline range to reflect the actual seriousness of the offense based on conduct ... underlying a potential charge not pursued in the case ... for any ... reason; and that did not enter into the determination of the applicable guideline range."

month period. Two of them may be uncharged crimes. *See* U.S.S.G. § 5K2.21. These statements were evidently planned, rather than spontaneous. On at least one occasion the statement was made under oath. It appears that Anderson's repeated false statements caused the government to devote considerable resources to an investigation that would have been unnecessary if he had been candid. Anderson did not recant because on reflection he became contrite. Rather, he confessed only when caught, after testing deceptive to questions put to him by the polygraph examiner.

■ Perhaps most significantly, it appears that Anderson made his false statements at a time when he knew, or reasonably should have known, that withholding accurate information could have injured the integrity of a case in which the death penalty might be sought. The government represents that it "can now state unequivocally that the defendant's false statements had little or no impact on the analysis whether to seek the death penalty in this case." Government's Sentencing Brief at 10. Nevertheless, those lies were, as a matter of law, material to this issue. A statement is material if it has a natural tendency to influence, or is capable of influencing, a decisionmaker. The state-

ment need not have actually influenced the actions of the government. *See First Circuit Pattern Jury Instructions—Criminal,* § 4.08; *United States v. Gaudin,* 515 U.S. 506, 509, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (quoting *Kungys v. United States,* 485 U.S. 759, 770, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988)); *United States v. Arcadipane,* 41 F.3d 1, 7 (1st Cir.1994).

Moreover, this court, to which the Sampson case is assigned, fully expects that Sampson's telephone call will be emphasized by the defense if there is a death penalty phase of his trial. The court cannot anticipate the total mix of information that will be available in any such proceeding. However, the telephone call certainly has the potential to influence a jury, perhaps decisively, on the ultimate issue of whether Sampson will live or die.

Therefore, the nature of the matter to which Anderson's false statements relate may contribute to taking his case out of the heartland of § 1001 prosecutions. A review of First Circuit decisions in the last decade indicates that several types of cases are typically prosecuted as violations of § 1001. False statements made to obtain government benefits have frequently been prosecuted as such crimes.[5] Similar-

---

5. *See, e.g., United States v. Singh,* 222 F.3d 6 (1st Cir.2000) (false statement made in application for social security card); *United States v. Rodriguez–De Jesus,* 202 F.3d 482 (1st Cir. 2000) (false statement made in attempt to collect on claim for Federal Emergency Management Agency assistance); *Smullen v. United States,* 94 F.3d 20 (1st Cir.1996) (false statement made in claim for benefits from the Department of Labor's Worker's Compensation Program); *United States v. Randazzo,* 80 F.3d 623 (1st Cir.1996) (false statements made on labels of shrimp sold to the Department of Defense); *United States v. Kelley,* 76 F.3d 436 (1st Cir.1996) (false statement made in effort to obtain Small Business Administration assistance in refinancing of commercial lobster boat); *United States v. Barbioni,* 62 F.3d 5 (1st Cir.1995) (false statement made in

claim for benefits from the Department of Labor's Worker's Compensation Program); *United States v. Rivera,* 55 F.3d 703 (1st Cir. 1995) (false statement made as part of scheme to obtain mortgage loan insurance benefits from the Department of Housing and Urban Development), *rev'g United States v. Stella Perez,* 839 F.Supp. 92 (D.P.R.1993); *United States v. Arcadipane,* 41 F.3d 1 (1st Cir.1994) (false statement made in claim for benefits from the Department of Labor's Worker's Compensation Program); *United States v. Stern,* 13 F.3d 489 (1st Cir.1994) (false statements made regarding performance and payment bonds needed to bid on Air Force contract); *United States v. Padin–Torres,* 988 F.2d 280 (1st Cir.1993) (false statement made to mask fraud related to misappropriation of

ly, misconduct concerning the Currency Transaction Reporting requirements have been prosecuted as a violation of § 1001.[6] False statements in connection with the criminal investigation of other crimes have been prosecuted as violations of § 1001, but it does not appear that the death penalty has been implicated in those investigations.[7]

Each of the foregoing offenses disrupted, or threatened to disrupt, the operation of the federal government in some respect. However, making a false statement to federal investigators is a particularly serious offense if the lie relates in any way to a possible death penalty prosecution. The death penalty is the ultimate sanction. It is also irrevocable. If an individual is executed because a jury had inaccurate or incomplete information, the error cannot be corrected.

As the Supreme Court has repeatedly emphasized in requiring that courts take special care to assure the fairness and integrity of death penalty proceedings, "death is different." *See, e.g., Ring v. Arizona,* ——— U.S. ———, ———, 122 S.Ct. 2428, 2441, 153 L.Ed.2d 556 (2002) ("As Arizona's counsel maintained at oral argu-

ment, there is no doubt that '[d]eath is different.' "); *Harmelin v. Michigan,* 501 U.S. 957, 994, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (identifying proportionality review as one of several areas "in which we have held that 'death is different,' and have imposed protections that the Constitution nowhere else provides"); *Gardner v. Florida,* 430 U.S. 349, 357, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (Stevens, J.) (plurality opinion) (stating that "five Members of the Court have now expressly recognized that death is a different kind of punishment from any other" and that "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."); *Furman v. Georgia,* 408 U.S. 238, 306, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring) ("The penalty of death differs from all other forms of criminal punishment, not in degree but in kind.").

The fact that death is indeed different may contribute to taking this case out of the heartland of § 1001 cases and to justifying an upward departure. Therefore, the court is continuing to consider whether the foregoing circumstances, individually

money received from the Government National Mortgage Association for defaulted government insured mortgages); *United States v. Heart Trace,* No. CIV. 99–155–M, 2001 WL 276966 (D.N.H. Mar. 16, 2001) (false statement made to defraud Medicare); *United States v. Reyes Mercado,* 871 F.Supp. 103 (D.P.R.1994) (false statement made in documents presented to the Federal Emergency Management Agency in order to justify previously allocated grants).

6. *See, e.g., United States v. Sebaggala,* 256 F.3d 59 (1st Cir.2001); *United States v. Beras,* 183 F.3d 22 (1st Cir.1999); *United States v. Fernandez–Ventura,* 132 F.3d 844 (1st Cir. 1998); *United States v. Ventura,* 85 F.3d 708 (1st Cir.1996); *United States v. Alvarado,* Civil No. 96–14, 1996 WL 226081 (D.P.R. Apr. 19, 1996).

7. *See, e.g., Scungio,* 255 F.3d at 13 (investigation related to bribery of members of Board of Tax Assessment Review); *United States v. Three Juveniles,* 886 F.Supp. 934 (D.Mass. 1995) (investigation related to violations of Federal Juvenile Delinquency Act by conspiring to intimidate black and Jewish residents); *United States v. Royal Caribbean Cruises, Ltd.,* 24 F.Supp.2d 155 (D.P.R.1997) (investigation related to violation of 33 U.S.C. §§ 1319 and 1321 which prohibit knowingly discharging a harmful quantity of oil into the navigable waters of the United States); *but cf. Maravilla v. United States,* 901 F.Supp. 62, 64 n. 5 (D.P.R. 1995) (investigation related to kidnaping, robbery, and murder).

or in combination, were in kind or degree not adequately take into account in formulating the guidelines and, if so, whether they should result in a sentence higher than that prescribed by the properly calculated guideline range. *See* 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0.

Finally, the PSR raises another issue that should be addressed further. It indicates that Anderson has serious health needs which may militate against a sentence of incarceration or favor a shorter sentence of imprisonment than might otherwise be appropriate. Therefore, the PSR should address the ability of the Bureau of Prisons to care for Anderson adequately if he is incarcerated.

In view of the foregoing, it is hereby ORDERED that:

1. The government shall provide to Probation forthwith the information necessary to address the issues raised in this Memorandum and any other information that Probation may reasonably request.

2. Probation shall prepare a revised PSR as soon as possible and provide it to the parties.

3. The parties shall file any objections to the revised PSR within seven days thereafter.

4. Probation shall prepare another Addendum to the PSR within seven days thereafter.

5. The parties may file supplemental sentencing memoranda within seven days thereafter.

6. After receiving the revised PSR and any further submissions by the parties, the court will reschedule the sentencing hearing.

7. While the court believes that Anderson and the public have an interest in having his sentencing occur as soon as is possible consistent with the requirement

that the court have accurate and complete relevant information, the court will provide any party an extension of time to respond to this Order if good cause is shown.