**UNITED STATES of America**

v.

**William H. ANDERSON**

**No. CR. 02–10102–MLW.**

United States District Court,
D. Massachusetts.

April 21, 2003.

Michael A. Collora, Daniel M. Rabinovitz, Dwyer & Collora, LLP, Boston, for William H. Anderson (1), Defendant.

Stephen G. Huggard, United States Attorney's Office, Boston, for U.S. Attorneys.

*MEMORANDUM AND ORDER*

WOLF, District Judge.

For the reasons described in detail at the March 18, 2003 hearing, and summarized in this Memorandum, the following rulings were made in connection with the sentencing of defendant William Anderson.

■ 1. Because the current Guidelines Manual, with the Amendments effective November 1, 2002, does not provide for more punishment than the November 1, 2000 Guidelines Manual that was in effect at the time of Anderson's crime of making a false statement to a government investigator, in violation of 18 U.S.C. § 1001, the current Manual was applied.

■ More specifically, in the 2000 Manual violations of § 1001 were addressed in U.S.S.G. § 2F1.1. Application Note 14 to

§ 2F1.1 then stated, in pertinent part, that:

> Where the indictment or information setting forth the count of conviction (or a stipulation as described in § 1B1.2(a)) establishes an offense more aptly covered by another guideline, apply that guideline rather than § 2F1.1.

In this case the undisputed facts demonstrated that on October 30, 2001 Anderson knowingly made a false material statement under oath [1] when he denied that he had received a telephone call from alleged murderer Gary Sampson on July 23, 2001. Thus, Anderson committed perjury, in violation of 18 U.S.C. § 1621, although he was not charged with that offense. *See Dunn v. United States,* 442 U.S. 100, 108–09, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979) ("Congress was aware that statements under oath were embraced by the federal perjury statute without regard to where they were given."). In these circumstances U.S.S.G. § 2J1.3 is the "more apt" guideline for Anderson's Offense. *See United States v. Kurtz,* 237 F.3d 154, 156 (2d Cir.2001); *cf. United States v. Scungio,* 255 F.3d 11, 16–17 (1st Cir.2001); *United States v. Duranseau,* 19 F.3d 1117, 1123 (6th Cir.1994).

The 2002 Manual moved § 1001 offenses to U.S.S.G. § 2B1.1. Section 2B1.1(c)(3)(C) states, in pertinent part, that:

> If ... the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct), apply that other guideline.

Application Note 11 to § 2B1.1(c)(3) reiterates the guidance given previously in Application Note 14 to § 2F1.1. It states, in pertinent part, that:

> Subsection (c)(3) provides a cross reference to another guideline in Chapter Two (Offense Conduct) in cases in which the defendant is convicted of a general fraud statute, and the count of conviction establishes an offense *more aptly covered* by another guideline.

(emphasis added). Thus, the 2002 Manual also directs that U.S.S.G. § 2J1.3 be used to calculate the Offense Level in this case. Section 2J1.3 is the same in the 2000 and 2002 Manuals.

The 2002 Amendments relating to § 1001 offenses merely clarified the previously existing Guidelines. They did not involve a substantive change in them. Nor did they raise the Guideline range for Anderson's Offense or otherwise change

---

**1.** Anderson did not assert in his objections to the Presentence Report that the investigators who interviewed him on October 30, 2001 were not authorized to administer oaths. Investigators for the Inspector Generals are authorized to administer oaths. *See* 5 U.S.C.App. 3 § 6(a)(5); *United States v. Correia,* 47 F.3d 1156, 1995 WL 64757 (1st Cir. Feb. 16, 1995) (unpublished); *United States v. Yoshida,* 727 F.2d 822 (9th Cir.1983) ("No particular formalities are required for there to be a valid oath. It is sufficient that, in the presence of a person authorized to administer an oath ... the affiant by an unequivocal act consciously takes on himself the obligation of an oath, and the person undertaking the oath understood that what was done is proper for the administration of the oath and all that is necessary to complete the act of swearing.").

The government originally represented that Anderson was not sworn before being interviewed and submitting an affidavit under the pains and penalties of perjury on October 30, 2001. *See* Govt.'s Second Sentencing Mem. at 6 ("While the statement was recorded in an affidavit, the affidavit memorializes what had just been stated in unsworn fashion."). Having read the interview report of Special Agent Frank Hopkins, the court questioned this contention. *See* Feb. 26, 2003 Memorandum and Order at 3. The government subsequently acknowledged that Anderson was administered an oath before being interviewed and submitting his affidavit on October 30, 2001. *See* Govt.'s Third Sentencing Mem. at 1. On March 18, 2003, Hopkins testified that he administered an oath to Anderson before the October 30, 2001 interview.

the consequences of his crime. Therefore, the Ex Post Facto Clause of the Constitution does not require the use of the 2000 Manual. *See Miller v. Florida,* 482 U.S. 423, 430, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). Accordingly, the current Manual was employed to calculate Anderson's sentence. *See United States v. Harotunian,* 920 F.2d 1040, 1041–42 (1st Cir.1990).

Pursuant to § 2J1.3, the Base Offense Level for Anderson's crime under both the 2000 and 2002 Manuals is 12, rather than 6 as it would have been if § 2F1.1 of the 2000 Manual or § 2B1.1 of the 2002 Manual alone prescribed the Guideline range. However, for the reasons explained below, the application of the cross-reference ultimately made no difference whatsoever in the sentence imposed. The parties advocated a Guidelines analysis that would have resulted in a 0–6 month range for Anderson's sentence. The court's calculation resulted in a 6–12 month range for Anderson's sentence. The court sentenced Anderson to 6 months in prison and, for the reasons described at the hearing and summarized below, would have imposed the same sentence in every respect if the Guideline range had been 0–6 months. *See United States v. Bermingham,* 855 F.2d 925, 935 (2d Cir.1988); *United States v. Ticchiarelli,* 171 F.3d 24, 35 (1st Cir. 1999); *United States v. Ortiz,* 966 F.2d 707, 718 (1st Cir.1992).

■ 2. After testimony from Special Agent Frank Hopkins of the Department of Justice Office of Inspector General, it was not proven that Anderson's perjury resulted in a "substantial interference with the administration of justice" by causing "the unnecessary expenditure of *substantial* government or court resources." U.S.S.G. § 2J1.3(b)(2) & A.N.1 (emphasis added). *Cf. United States v. Butt,* 955 F.2d 77, 88 (1st Cir.1992) (applying 3–level increase when perjury required govern-

ment to locate more witnesses and immunize some who otherwise would have been prosecuted); *United States v. Atkin,* 29 F.3d 267, 268 (7th Cir.1994) (applying 3–level increase when grand jury had to summon to Indiana five additional witnesses from as far away as Texas). *But see United States v. Lueddeke,* 908 F.2d 230, 234 (7th Cir.1990) (holding that two weeks of additional investigation was "easily" enough to justify the enhancement). Because "substantial interference with the administration of justice" was not proven, a 3–level increase in the Offense Level was not applied.

■ 3. Anderson knowingly lied to the polygraph examiner on December 12, 2003 when he claimed that he had not received a telephone call from Sampson. Thus, the court considered whether to increase the Offense Level by 2 pursuant to U.S.S.G. § 3C1.1 for a willful attempt to obstruct or impede the administration of justice during the course of the investigation of his false statement, in violation of 18 U.S.C. § 1001, on October 30, 2001. Anderson's false statement to the polygraph examiner was not made under oath. Pursuant to Application Note 4(g) to U.S.S.G. § 3C1.1, providing an unsworn materially false statement to a law enforcement officer justifies the 2–level enhancement only if it "*significantly* obstructed or impeded the official investigation or prosecution of the instant offense" (emphasis added). Anderson was told on December 12, 2001 that the polygraph indicated that his responses were deceptive and then promptly admitted that he had lied on October 30, 2001. Thus, his attempt to obstruct justice did not significantly impede the investigation. Therefore, a 2–level enhancement pursuant to U.S.S.G. § 3C1.1 was not appropriate. *See United States v. Moreno,* 947 F.2d 7, 10–11 (1st Cir.1991).

■ 4. Anderson could have been charged with violating § 1001 by lying to the polygraph examiner on December 12, 2002, but was not.[2] The polygraph examination on December 12, 2001 was both a continuation of the Department of Justice Inspector General's investigation that began in August 2001 and included Anderson's sworn interview and affidavit on October 30, 2001, and also a related investigation concerning whether Anderson or anyone else had lied to the investigators. Accordingly, the false statement made on December 12, 2001 would not have raised the Guideline range for Anderson's Offense even if it had been charged as a separate crime. See U.S.S.G. § 3D1.2(b). Therefore, the court did not decide whether the December 12, 2001 statement was a second crime constituting Relevant Conduct under U.S.S.G. § 1B1.3. Compare United States v. Salas–Camacho, 859 F.2d 788, 790–91 (9th Cir.1988) with United States v. Graham, 60 F.3d 463, 466–67 (8th Cir.1995).

5. As described in the October 23, 2002 Memorandum and Order, 229 F.Supp.2d 17, 23 (D.Mass.2002), Anderson's reported statements to the media after his guilty plea raised a question whether he should receive a 2–level reduction in his Offense Level for Acceptance of Responsibility pursuant to U.S.S.G. § 3E1.1(a). Anderson chose not to speak at the sentencing hearing. However, in a letter dated September 24, 2002, written before the court expressed doubt about whether he should receive a reduction for Acceptance of Responsibility, Anderson expressed sufficient remorse to merit the reduction. It was, therefore, granted.

6. As a result of the foregoing rulings, Anderson's Total Offense Level was 10. His Criminal History Category was I. The Guideline ranges for his sentence, therefore, were: 6–12 months in prison; 24–36 months of Supervised Release; a $2000–$20,000 fine; and a mandatory $100 special assessment.

At Offense Level 10 and Criminal History Category I, Anderson was in Zone B of the Sentencing Table. Therefore, the court was authorized to sentence Anderson to prison or to probation if it substituted home detention for the minimum term of imprisonment. See U.S.S.G. §§ 5B1.1(a)(2), 5C1.1(c)(3) and (e)(3).

■ 7. The government and Anderson each advocated a sentence of two years probation with the first six months to be served in home detention, which would have allowed Anderson to leave home for work and medical appointments. Anderson had requested a downward departure, if necessary, based primarily on his health, but emphasized that because he was in Zone B, the court did not have to depart to impose the requested sentence of probation.

The court recognized that the Guidelines permit downward departures based upon "an extraordinary physical impairment." U.S.S.G. § 5H1.4; United States v. Woodward, 277 F.3d 87, 92–93 (1st Cir.2002); United States v. Hilton, 946 F.2d 955, 957–60 (1st Cir.1991). Anderson does have diabetes and certain other serious health

---

**2.** The government does, at times, charge false statements to a polygraph examiner as a violation of § 1001. For example, in the highly publicized case of United States v. Abdullah Higazy, 02–MAG–53 (S.D.N.Y.), following the September 11, 2001 attack on the World Trade Center an Egyptian student was charged with lying to FBI agents during a polygraph examination in which he denied owning a radio left in a hotel, but the charges were dropped after a hotel security guard admitted that he lied in claiming the radio had been found in Higazy's room. See "FBI Agents Cleared in False Confession," Boston Globe, Nov. 26, 2002, at A11.

problems. However, the Bureau of Prisons twice reviewed medical records and reports concerning Anderson. It advised the parties and the court that: there are over 5000 diabetics in federal prisons; the Bureau of Prisons has specialized facilities for inmates with serious medical needs that cannot be adequately treated in other prison facilities; and the Bureau of Prisons utilizes local community specialists to provide needed care that cannot be furnished by doctors employed by the Bureau of Prisons. *See also* Legal Resources Guide to the Federal Bureau of Prisons (2003), at 26–29. The Bureau of Prisons twice opined that it would be able to provide appropriate medical care for Anderson.

The court agreed that the Bureau of Prisons could adequately treat Anderson's medical needs. Therefore, it held that it would not have departed downward based on his health if a downward departure was required to impose the sentence of probation advocated by the parties.[3] *See Hilton*, 946 F.2d at 960 n. 5 ("[E]ven when an ailment is both rare and serious, a downward departure does not necessarily ensue. If the condition can be adequately treated in a prison setting, and no other countervailing considerations pertain, then in such event, resort to section 5H1.4 (and, in quantitative terms, section 5K2.0) is not mandatory.").

The court also decided that although an upward departure from the 6–12 month range for imprisonment was permissible in the circumstances of this case, Anderson's health made such a departure inappropriate. The court concluded, however, that a sentence that included six months in prison was the minimum sentence sufficient to serve the statutory purposes of sentencing, particularly the interests of general deterrence and recognizing the seriousness of the offense. *See* 18 U.S.C. § 3553(a)(2).

More specifically, an upward departure would have been permissible pursuant to U.S.S.G. § 5K2.0. This case involved an "aggravating ... circumstance of a kind ... not adequately taken into consideration by the Sentencing Commission in formulating the guidelines" for false statements or perjury. U.S.S.G. § 5K2.0. Indeed, the "offense ... risked substantial non-monetary harm," for which the Guidelines encourage an upward departure. U.S.S.G. § 2B1.1, A.N.15(A)(ii).

■ As discussed in the October 23, 2002 Memorandum and Order, 229 F.Supp.2d at 24, and in the February 26, 2003 Memorandum and Order, 249 F.Supp.2d 30 n. 1, 31–32, Anderson made his false statements at a time when he knew, or should have known, that withholding accurate information could have injured the integrity of a case in which the death penalty might be sought. Indeed, through counsel, Anderson acknowledged that he knew that the telephone call would be helpful to Sampson's case. *See* Def.'s Third Sentencing Mem. at 2 ("To be sure, Mr. Anderson understood that Mr. Sampson's call to the FBI was somehow helpful to Mr. Sampson's case").

In fact, if Sampson pleads guilty or is convicted, a jury will have to decide whether aggravating factors outweigh mitigating factors in deciding whether a sentence of death is justified. *See* 18 U.S.C. § 3593(e). As was prominently publicized prior to October 30, 2001 and explained to the court in November 2001, Sampson's coun-

---

**3.** Anderson also mentioned, but did not at the sentencing hearing argue, aberrant conduct as a possible ground for a downward departure. The court stated that a downward departure based in whole or in part on aberrant conduct was not justified. *See* § 5K2.20 & A.N.1.

sel intend to argue that his call to the Federal Bureau of Investigation (the "FBI") in an effort to surrender prior to committing the murders to which he has reportedly confessed is a mitigating factor that should cause the jury to let him live. *See, e.g.,* Feb. 26, 2003 Memorandum and Order, 2003 WL 942573, at *2 (quoting at length August 31, 2001 *Boston Herald* article headlined "Sampson alleged FBI call crucial to his fate," which reported, in part, that Sampson's then alleged telephone call to the FBI "could be the difference in whether the accused murderer lives or dies").

While the court cannot predict how the jury will decide any issue in the Sampson case, Anderson's false denials of receiving Sampson's call had the potential to deprive the jury of information that could prove material to whether Sampson will be sentenced to death. The death penalty is the ultimate sanction. As Justice Potter Stewart wrote:

> The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability.

*Furman v. Georgia,* 408 U.S. 238, 306, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring). As Justice Stewart emphasized, if an individual is executed because a jury had inaccurate or incomplete information, the error cannot be corrected.[4] These facts took Anderson's case out of the heartland of prosecutions for false statements and perjury, and made an upward departure permissible.[5]

In addition if, contrary to the court's conclusion, a cross-reference to the perjury Guideline, § 2J1.3, was not appropriate, and the Guideline range for Anderson's sentence was 0–6 months, rather than 6–12 months as it would have been if he had been charged with perjury, the government's charging decision would provide the court with the discretion to depart upward.

The introduction to both the 2000 and 2002 Manuals states with regard to "Real Offense v. Charge Offense Sentencing," that "a sentencing court may control any inappropriate manipulation of the indict-

---

**4.** Prosecutors, defense lawyers, judges and citizens in Massachusetts, and indeed throughout the United States, have recently been educated to understand that the risk that a defendant might be unfairly convicted and/or sentenced to death is not merely theoretical. For example, in 2001, the Suffolk County District Attorney acknowledged that "a great wrong was committed" when, in 1967, Joseph Salvati and three other men were unfairly convicted and sentenced to death because the FBI withheld information that its informants, rather than the defendants, had murdered Edward Deegan. *See* Carey Goldberg, "An Innocent Man Goes Free 33 Years After Conviction," *New York Times,* Feb. 2, 2001, at A12. After the death penalty was declared unconstitutional in 1972, in *Furman v. Georgia, supra,* their sentences were reduced to life in prison. Two of them died while incarcerated. Salvati served over thirty years before being released in 1997. The fourth defendant, Peter Limone, was released in 2001. This experience should increase the dedication of everyone involved in the administration of justice to assuring that trials in which the death penalty might be imposed involve evidence that is accurate and complete in order to minimize the risk that an irrevocable, fatal error will be made. *See also* Report of the Governor's Commission on Capital Punishment (Apr. 15, 2002), *available at* http://www.idoc.state.il.us/ccp/.

**5.** The heartland of a § 1001 case in the First Circuit is described in the October 23, 2002 Memorandum and Order, 229 F.Supp.2d at 24–26 & nn. 5–7. It generally includes false statements made to obtain government benefits and misconduct concerning Currency Transaction Reporting requirements. *Id.* False statements in connection with the criminal investigation of other crimes have also been prosecuted as violation of § 1001, but it does not appear that the death penalty has been implicated in those investigations. *Id.*

ment through use of its departure power." 2002 Guidelines Manual at 6; 2000 Guidelines Manual at 6. *See also United States v. Figaro,* 935 F.2d 4, 6–7 (1st Cir.1991).

The Principles of Federal Prosecution set forth in the United States Attorneys' Manual state, in pertinent part, that, "the attorney for the government should charge, or should recommend that the grand jury charge, the most serious offense that is consistent with the nature of the defendant's conduct, and that is likely to result in a sustainable conviction." U.S.A.M. § 9–27.300. The United States Attorney for the District of Massachusetts, Michael Sullivan, has described this as the policy of his office and the strict adherence to this policy in drug and firearm cases has generated public controversy. *See, e.g.,* Thanassis Cambanis, "Tougher Sentences Pushed; US Attorney Focuses on Drug Crime," *Boston Globe,* Nov. 16, 2002, at A1.

Anderson admitted facts constituting perjury prior to the filing of the information in this case. Yet the United States Attorney did not charge him with perjury. Nor was Anderson charged with violating § 1001 by making false statements to the polygraph examiner on December 12, 2002. Therefore, if the cross-reference to the perjury Guideline, § 2J1.2, were not applicable, the above-quoted statement in the Introduction to the Guidelines Manuals would encourage a possible upward departure.[6]

However, while the court found that it had the discretion to depart even above the sentencing range prescribed by the perjury Guideline, § 2J1.3, it also found that it should not do so with regard to Anderson. *See* U.S.S.G. § 5K2.0 (a sentencing court may depart if it finds " 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that *should* result in a sentence different from that described.' ") (quoting 18 U.S.C. § 3553(b); emphasis added). This decision was based largely on Anderson's health.

Anderson's medical status persuaded the court that a sentence of six months was minimally sufficient to serve the statutory purposes of sentencing, including the need to recognize the seriousness of the offense and generally deter others from committing comparable crimes. *See* 18 U.S.C. § 3553(a)(2). As indicated earlier, however, no lesser sentence would have been sufficient to send a message to others who might be tempted to lie to federal investigators, or to provide just punishment in this case.

Therefore, the court imposed a sentence of six-months in prison, which it recommended be served in a Bureau of Prisons medical facility equipped to address Anderson's medical needs;[7] twenty-four

---

**6.** Moreover, Application Note 14 to U.S.S.G. § 2F1.1 of the 2000 Guidelines Manual states, in pertinent part:

Where the indictment or information setting forth the count of conviction (or a stipulation as described in § 1B1.2(a)) establishes an offense more aptly covered by another guideline, apply that guideline rather than § 2F1.1. *Otherwise, in such cases, § 2F1.1 is to be applied, but a departure from the guidelines may be considered.*

(emphasis added). In the instant case, Anderson was charged with making a false statement in violation of § 1001, but the undisputed facts demonstrated that he committed perjury in violation of § 1621. Thus, if the cross-reference did not apply, an upward departure would have been encouraged by the 2000 Manual if, as Anderson advocated, it had been used.

**7.** On April 4, 2003, the court allowed Anderson's motion that it recommend that he serve his sentence at the medical center at FMC Devens in Massachusetts.

months Supervised Release; a $2000 fine; and a $100 Special Assessment. As indicated earlier, the court also explained that it would have imposed the exact same sentence in every respect if the Guideline range had been 0–6 months rather than 6–12 months. *See Bermingham,* 855 F.2d at 935; *Ticchiarelli,* 171 F.3d at 35; *Ortiz,* 966 F.2d at 718.