**UNITED STATES of America**

v.

**William H. ANDERSON**

**No. CR.02–10102–MLW.**

United States District Court,
D. Massachusetts.

Feb. 26, 2003.

Michael A. Collora, Daniel M. Rabinovitz, Dwyer & Collora, LLP, Boston, MA, for William H. Anderson (1), Defendant.

Stephen G. Huggard, United States Attorney's Office, John Joseph Moakley Federal, Boston, MA, for U.S. Attorneys.

*MEMORANDUM AND ORDER*

WOLF, District Judge.

The court has read the Revised Presentence Report and Addendum concerning William H. Anderson (the "Revised PSR"), the sealed version of the Government's Second Sentencing Memorandum,[1] and the Supplemental Sentencing Memorandum of Defendant William Anderson. They suggest questions in addition to those raised by the court previously, which remain. The court wishes to provide the parties notice of these questions prior to the sen-

---

1. The court has read the sealed portion of the Government's Second Sentencing Memorandum. It seems to be intended to support Anderson's argument that he should not be punished for the murders that Sampson allegedly committed after calling the FBI. *See* Supplemental Sentencing Memorandum of Defendant William Anderson at 1–2. However, as explained in detail in the October 23, 2002 Memorandum and Order, at pages 13–17, the court is considering an upward departure in part because Anderson's false statements had the potential to injure the integrity of a then possible death penalty prosecution, not because three people were murdered after Sampson's telephone call. More specifically, the Federal Death Penalty Act requires that a jury consider whether aggravating factors outweigh mitigating factors in deciding whether a sentence of death is justified. *See* 18 U.S.C. § 3593(e). As described *infra*, Sampson intends to argue that his telephone call to the FBI is a mitigating factor. The court cannot predict how the jury will decide any issue in the Sampson case. However, the court continues to be concerned that Anderson's false statements had the potential to deprive a jury of information that could prove to be material to whether, if convicted, Sampson will be sentenced to death.

tencing hearing, which will be held on March 17, 2003, at 3:00 p.m.

Paragraph 14 of the Revised PSR addresses the questioning of Anderson in August 2001. It states, in part, that: "Investigative reports indicate that queries of employees were not documented ..." The government did not object to this statement as incorrect. Rather, in its Second Sentencing Memorandum, at page 3, it states that, "the precise wording of the questions asked of [Anderson and others] or the answers given was not recorded." Similarly, Anderson's Objection # 2 to the Revised PSR states that there is "no record of the precise questions posed to Anderson ..." However, an August 20, 2001 report of Department of Justice, Office of Inspector General Special Agent Frank J. Hopkins provided to the Probation Department (Exhibit 1 hereto) states that, "FBI Supervisor Rick Deslauriers was assigned the task of questioning the receptionists and the duty agent and he is preparing a written report with those responses ..." The Probation Department advises that it did not receive a report written by Deslauriers. Accordingly, the government shall, by March 7, 2003, provide any such report to the Probation Department, the court, and Anderson,[2] or represent that no written report was prepared concerning the August 2001 questioning of Anderson and others.

In addition, Anderson's Objection # 2 states, in effect, that it is not proven that he knowingly lied to investigators in August 2001 when he denied that he received the telephone call from Sampson. If this is indeed Anderson's position, this issue may be explored at the sentencing hearing.

The supplemental memoranda filed by the government and Anderson each represent that Anderson falsely denied under oath that he received Sampson's telephone call only in his October 30, 2001 affidavit. More specifically, the government states: "While the [false] statement was recorded in an affidavit, the affidavit memorializes what had just been stated in unsworn fashion." Gov.'s Second Sentencing Memorandum at 6. Similarly, Anderson states that: "The charge resulted from Mr. Anderson's submission of a false affidavit in connection with an administrative investigation conducted by the Department of Justice, Office of Inspector General ..." Def.'s Supplemental Sentencing Memorandum at 3. However, Hopkins' November 1, 2001 report (Exhibit 2 hereto) states that Anderson was placed under oath before he was interviewed and later provided a sworn affidavit memorializing his earlier, sworn oral statements.

Therefore, the government and Anderson shall, by March 7, 2003, inform the court whether they dispute Hopkins' representation that Anderson was sworn before being interviewed on October 30, 2001. If necessary, the court may hear testimony on this issue at the sentencing hearing.

Paragraph 22 of the Revised PSR states that: "There is no information to indicate that Anderson was placed under oath" before being given the polygraph examination that he failed on December 12, 2001. This point should be clarified. Therefore, the government shall, by March 7, 2003, inform the court whether Anderson was sworn before the polygraph examination.

Anderson argues that: "There is no showing that Mr. Anderson was aware [on October 30, 2001] that his misstatement might materially affect any case other than his own or that he was aware of the death

---

**2.** If a report concerning the August 2001 questioning of Anderson was produced to him previously, the government shall state when this occurred.

penalty issue on October 30, 2001 when he denied receiving the telephone call." Def.'s Supplemental Sentencing Memorandum at 16. However, the government asserts that:

> Upon his capture, [Sampson] immediately, loudly, and publicly began blaming the F.B.I. for his killing spree, attempting to shift the blame for the three innocent victims from himself to whoever at the F.B.I. took his telephone call ... Not surprisingly, this claim made front-page news and was carried by every significant media outlet in the metropolitan Boston area.

Gov.'s Second Sentencing Memorandum at 2.

The government's contention appears to be correct. For example, on August 31, 2001, the *Boston Herald* published an article headlined "Sampson's alleged FBI call crucial to his fate" (Exhibit 3 hereto). It stated, in part that:

> A desperate phone call allegedly made to the FBI by Gary Sampson the day before he embarked on a weeklong killing spree could be the difference in whether the accused triple murderer lives or dies, a source said yesterday. "It could make for a very compelling case against the death penalty," a legal source close to the case said. "One answer as to why he shouldn't be put to death is because he was trying to get help, tried to turn himself in and he was turned away by the government."
>
> \*    \*    \*    \*    \*    \*
>
> The Herald also reported yesterday that the case is on track to be sent to a federal grand jury. If indicted federally, Sampson could face the death penalty under federal anti-carjacking laws, but the alleged phone call may pose problems for prosecutors, the legal source said.
>
> "It would certainly have a bearing on whether it becomes a death penalty

case," the source said. "If it turns out to be true that the defendant tried to take himself off the streets the day before the murders, one, it's very embarrassing to the government, and two, the jury might say, 'Here was a guy who was trying to turn himself in.' It's potentially mitigating."

> The source cited as an example a New Jersey death penalty case in which double-murderer Anthony McDougald won a life sentence after jurors found he tried to check himself into a mental hospital hours before the slayings.

According to Hopkins' November 1, 2001 report, on October 30, 2001, Anderson stated under oath that, "[h]e [was] familiar with the allegations made by Sampson ..." Ex. 2.

At the defendant's November 5, 2001 initial appearance in *United States v. Sampson*, Cr. No. 01–10384–MLW, Sampson's counsel stated that he was definitely requesting from the government any evidence that Sampson called the FBI. *See* Nov. 5, 2001 Transcript Excerpt at 43–48 (Exhibit 4 hereto). The court then discussed the government's important obligation to seek any such evidence as part of its obligation to disclose information that is favorable to Sampson and material to punishment. *Id.*

It is not clear to the court whether Anderson contends that as of October 30, 2001, he was not aware that consideration was being given to prosecuting Sampson federally in order to seek the death penalty and that the issue of whether Sampson had called the FBI was relevant to whether the death penalty would be sought and/or imposed. This issue may be explored at the sentencing hearing.