No. 95-1522

United States of America,     *
    *
       Appellee,           *    Appeal from the United States
    *    District Court for the
      v.              *    District of Minnesota.
    *
Y. George Roggy,         *
    *
       Appellant.        *

Submitted:  October 17, 1995

Filed:  January 31, 1996

Before WOLLMAN, FLOYD R. GIBSON, and MORRIS SHEPPARD ARNOLD,
     Circuit Judges.

WOLLMAN, Circuit Judge.

After a jury found Y. George Roggy guilty of mail fraud in violation of 18 U.S.C. § 1341, adulteration of a raw agricultural commodity in violation of 21 U.S.C. §§ 331(k) and 333(a)(2), and using a pesticide in a manner contrary to its label in violation of 7 U.S.C. § 136(j), the district court[1] sentenced him to sixty months' imprisonment, three years of supervised release, and 200 hours of community service.  Roggy appeals his conviction and sentence.  We affirm.

**I.**

Roggy was a licensed pesticide applicator and distributor in Minnesota and elsewhere.  He owned and operated a pesticide

---

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

application business named Fumicon, Inc. and a pesticide distribution business named Aggesch, Inc. Roggy was regarded by his peers as an expert in the field of pesticide application.

In 1989, General Mills, Inc. (General Mills) hired Roggy to apply pesticide to raw oats that were to be used in making cereal. General Mills initially purchased the pesticide Reldan and instructed Roggy to use it on the oats. Reldan was approved by the Environmental Protection Agency (EPA) for use on raw oats. In 1993, General Mills asked Roggy to purchase Reldan himself and bill General Mills for the product and his services accordingly.

Instead of purchasing Reldan, however, Roggy purchased and used Dursban, a product that was not approved by the EPA for use on raw oats. Roggy submitted invoices for his services to General Mills over the course of thirteen months. The invoices stated that Reldan had been applied at an approximate cost of $173 per gallon, when Roggy had actually used Dursban, which cost approximately $83 per gallon. The difference between the cost of Dursban and the invoice price for Reldan was approximately $85,000.

In 1994, the Food and Drug Administration (FDA) detected the presence of chlorpyrifos-ethyl in some of General Mills' oats while taking random samples from various grain elevators. Chlorpyrifos-ethyl is not approved for use on raw oats and is found in the pesticide Dursban. Further testing by the FDA revealed that all of General Mills' grain processing facilities in the Twin Cities and Duluth, Minnesota, and in Superior, Wisconsin, had been contaminated. In addition, widespread Dursban contamination was found in oats and oat flour from these facilities, in finished cereal products, and in a spraying apparatus owned by Roggy and located at the Superior facility. Approximately 16 million bushels of oats and 160 million boxes of cereal were tainted by the unapproved pesticide.

The investigation eventually focused on Roggy, who initially denied using Dursban.  On June 6, 1994, he told an FDA investigator that he had used Reldan in treating the oats.  He showed the investigator two barrels that he had used, claiming that they contained Reldan.  One barrel displayed a Reldan label but was empty.  The other barrel was unlabeled but contained some pesticide.  Tests conducted by the FDA subsequently revealed that both barrels contained Dursban.  On the same day that he was interviewed by the FDA investigator, Roggy returned an unused barrel of Dursban to his supplier.

In an interview with employees of General Mills on June 12, 1994, Roggy admitted that he had used Dursban in treating the oats. He acknowledged making the switch because he was experiencing financial difficulties.  Roggy was thereafter charged with mail fraud, adulteration of a raw agricultural commodity, and misuse of a pesticide.

## II.

Roggy first contends that his due process rights were violated when the district court denied his motion requesting the government to disclose any information in its possession regarding the relative toxicity, similarity, safety and risk analyses of Dursban and Reldan.  In Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment[.]" Evidence is material only if it is likely that, had the evidence been disclosed, the outcome of the proceeding would have been different.  United States v. Quintanilla, 25 F.3d 694, 698 (8th Cir.) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)), cert. denied, 115 S. Ct. 457 (1994).

We agree with the district court that the evidence at issue was immaterial to the charges contained in the indictment. First, it is clear that information regarding the safety of Dursban did not relate to the mail fraud charges brought under 18 U.S.C. § 1341. The only evidence that was relevant to the fraud charges was the fact that Roggy had substituted Dursban for Reldan and had billed General Mills for the higher-priced Reldan, thereby causing General Mills to suffer damage. Thus, any evidence regarding the similarity between the two pesticides would not have cleared Roggy of the fraud charges.

Nor was the information pertinent to the charge of adulteration of a raw agricultural commodity in violation of 21 U.S.C. §§ 331(k) and 333(a)(2).[2] Section 331(k) prohibits any act that results in adulteration of a food, if the act is done while the food is held for sale after shipment in interstate commerce. A food is considered adulterated "if it is a raw agricultural commodity and it bears or contains a pesticide chemical which is unsafe within the meaning of section 346a(a) of this title[.]" 21 U.S.C. § 342(a)(2)(B). Absent a tolerance level or an exemption from the tolerance requirement, a pesticide is unsafe if it is not generally recognized among experts as safe for use on the particular raw agricultural commodity. 21 U.S.C. § 346a(a).

The above statutes make clear that evidence comparing Dursban and Reldan was immaterial to the adulteration charge. The relevant issue was whether Roggy caused the oats to be adulterated when he applied the Dursban. There was no tolerance level or exemption from the tolerance for Dursban pertaining to raw oats. Therefore, the only pertinent evidence with respect to the adulteration charge was whether Dursban was generally recognized as safe for use on

_____

[2] Roggy is not contesting his misdemeanor conviction for using a pesticide in a manner contrary to its label in violation of 7 U.S.C. § 136(j).

oats within the meaning of section 346a. Comparison evidence regarding Dursban and Reldan was irrelevant, as was evidence showing that Dursban was safe for use on other stored grains.

Roggy's Brady requests would not have led to any information that was material to the crimes charged in the indictment. Thus, the district court was correct in denying Roggy's motion.

### III.

Roggy also contends that the district court erred in excluding evidence showing that the relative wholesale price of Dursban was higher than Reldan. He claims that this information would have shown that General Mills was not getting "ripped off" when Roggy marked up the price of Dursban to that of Reldan. Again, this evidence was simply not relevant to any of the charges contained in the indictment. The government simply had to prove that Dursban was an unapproved pesticide for use on oats and that Roggy billed General Mills for Reldan when he was actually using Dursban. Any evidence regarding the price of Dursban on the wholesale market was irrelevant because Roggy, at all times, falsely represented that he was using Reldan; he did not simply mark up the price of Dursban to that of Reldan. Thus, the evidence was properly excluded.

### IV.

Roggy contends that the court erred in sentencing him to sixty months under U.S.S.G. § 2F1.1. First, he claims that the court miscalculated the appropriate loss figure. The court found that the amount of the loss General Mills suffered was in excess of $80 million, resulting in the maximum increase in the base offense level.[3]

_____

[3]The district court found that General Mills sustained an actual loss of $146.9 million as follows:  $2.3 million --

## A. Amount of Loss

We review the district court's determination as to factual issues concerning the amount of loss under the clearly erroneous standard.  United States v. Morris, 18 F.3d 562, 570 (8th Cir. 1994) (citing United States v. Earles, 955 F.2d 1175, 1180 (8th Cir. 1992)).  Interpretation of the sentencing guidelines and application of the guidelines to the facts of the case is subject to a de novo standard of review, however.  United States v. Willis, 997 F.2d 407, 417 (8th Cir. 1993), cert. denied, 114 S. Ct. 704 (1994).

Section 2F1.1 provides a base level of six for offenses involving fraud or deceit.  Under section 2F1.1(b), the base level is increased according to the amount of loss attributed to the fraud.  In calculating the loss, the court will use either the amount of the actual loss resulting from the fraud or the amount of loss the defendant attempted to inflict, whichever is greater.  § 2F1.1, comment. (n.7); Morris, 18 F.3d at 570.  The commentary to section 2F1.1 contains special provisions for determining the loss in product substitution cases because damages in such cases are frequently substantial.  See § 2F1.1, comment. (n.7(c)).  It provides that, in addition to direct damages, consequential foreseeable damages can be used to compute the loss.  Id.

Roggy claims that the amount of the loss should be either $85,000, which was the amount he overcharged General Mills, or $166,000, which was the total bill for his services.  This would result in a base level of twelve or thirteen instead of the maximum base level of twenty-four.  He contends that consequential damages may only be considered in government fraud procurement cases,

---

legal/consulting fees; $22.7 million -- marketing costs; $11.9 million -- sales costs; $100 million -- operating costs; and $10 million -- contingency fund.

citing United States v. Wilson, 993 F.2d 214 (11th Cir. 1993), in support of his argument.  In Wilson, however, the court stated that consequential damages may be considered in "government procurement and product substitution frauds[.]"  Id. at 217 (emphasis added). It is true that the two examples listed in Application Note 7(c) to section 2F1.1 relate to cases in which the government was defrauded; however, both the title to and the general rule contained in subsection (c) do not limit its application to cases where the government is a party.  Thus, we hold that the district court was correct in considering consequential damages in calculating the loss.

In any event, the actual loss suffered by General Mills was much greater than either of the amounts Roggy claims.  In addition to being charged for Roggy's fraudulent services, General Mills was left with more than 16 million bushels of tainted oats and 160 million boxes of tainted cereal.  Roggy not only contaminated the oats that he sprayed, he contaminated the facilities where those oats were processed as well as the unsprayed oats that moved through those facilities.  General Mills sustained huge losses attributable to the contaminated oats and incurred additional expenses in cleaning its production facilities.

Also without merit is Roggy's contention that the court should have used either $85,000 or $166,000 in calculating the loss because that was the amount of the loss he intended to inflict on General Mills.  The intended loss figure is only used in calculating the loss if it is greater than the actual loss.  § 2F1.1, comment. (n.7).  Thus, the district court was correct in using the actual loss sustained by General Mills of $146.9 million in calculating the appropriate offense level.

## B.  Use of a Special Skill

Roggy also claims that the district court erred when it

increased the base level for use of a special skill under U.S.S.G. § 3B1.3.  The district court found that Roggy was one of the top pesticide applicators in Minnesota and that "his skill and knowledge of the product and chemicals, through his teaching and lecturing of practically all of the pesticide people in this state and in the upper midwest area" warranted an increase in the base level.  An adjustment in sentencing is entitled to great deference and is reviewed under the clearly erroneous standard.  United States v. Culver, 929 F.2d 389, 392 (8th Cir. 1991) (citing United States v. Nunley, 873 F.2d 182, 187 (8th Cir. 1989)).

Section 3B1.3 allows the base level to be increased by two points if the defendant used a special skill to facilitate the commission or concealment of the offense.  The commentary to that section states that a special skill is a skill not possessed by the general public and which usually requires substantial education, training or licensing.  § 3B1.3, comment. (n.2).  Some examples include pilots, attorneys, doctors, and chemists.  Id.

Roggy was licensed as a master pesticide applicator.  His knowledge of pesticides led him to switch the unapproved Dursban for the approved Reldan because he believed that such a switch could not be detected.  Roggy's claim that he did not use his skill as a pesticide applicator when he submitted the fraudulent invoices to General Mills is unpersuasive.  We have held that use of a special skill does not have to be directly related to the offense of the conviction.  See United States v. Graham, 60 F.3d 463, 469 (8th Cir. 1994) (citing Culver, 929 F.2d at 393).  Because Roggy used his expertise in the selection and application of pesticides to facilitate a fraud on General Mills, we find that the enhancement was proper.

## C.  Acceptance of Responsibility

Roggy also claims the court erred in refusing to decrease the

base level for acceptance of responsibility under U.S.S.G. § 3E1.1. Roggy argues that the district court's refusal to grant him a reduction for acceptance of responsibility was based solely upon his exercise of his right to proceed to trial.

The district court stated at the sentencing hearing that "[p]ursuant to Section 3E1.1 in application note two . . . a defendant who puts the government to its burden of proof at trial is not entitled to a reduction." As the district court well knew, of course, Application Note 2 goes on to state that "conviction by trial does not automatically preclude a defendant from consideration for such a reduction." Application Note 2 also states that no adjustment is warranted when the defendant denies the factual element of guilt, goes to trial, is convicted, and only then admits guilt and expresses remorse.

Because the sentencing judge is in a unique position to evaluate the defendant's acceptance of responsibility, that determination is entitled to great deference on review. § 3E1.1, comment. (n.5). We hold that the district court did not err in finding that Roggy had not clearly accepted responsibility for his actions. The Presentence Investigation Report (PSR) recommended that the district court deny a reduction because Roggy failed to meet the requirements contained in section 3E1.1. When first questioned by the FDA investigator, Roggy denied using the unapproved pesticide. Although Roggy eventually admitted making the switch, he continued to assert that his actions did not amount to fraud. According to the PSR, Roggy still claims that he believed Dursban was a generic equivalent for Reldan and that therefore the pesticides could be substituted much like "a generic brand of aspirin and Bayer aspirin." Because Roggy continues to deny the fraud, he is not entitled to a reduction for acceptance of responsibility. See United States v. Edgar, 971 F.2d 89, 92 (8th Cir. 1992) (denying downward departure when defendant denied any intent to defraud his creditors). Moreover, his mere expression of

-9-

remorse does not warrant a reduction under section 3E1.1. <u>See</u> <u>United States v. Sloman</u>, 909 F.2d 176, 182 (6th Cir. 1990) (holding no departure warranted when defendant expressed regret but denied fraudulent intent).

We note that the district court had given careful thought and consideration to the sentence it felt was warranted by the facts in the case, as reflected in its statement that "I've lost a lot of sleep thinking about what should happen. And I've read the guidelines and studied the guidelines." This, then, is not one of those cases in which there might be some question that the district court was unaware of its authority to grant an acceptance of responsibility reduction. Rather, the record reflects the district court's informed, conscientious, considered exercise of the authority granted to it by the sentencing guidelines.

We have carefully examined Roggy's other claims and find them to be without merit.

The conviction and sentence are affirmed.

A true copy.

        Attest:

            CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.