**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 23-4137**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

ROJAY LAWSON,

        Defendant – Appellant.

Appeal from the United States District Court for the District of South Carolina, at Beaufort. Bruce H. Hendricks, District Judge.  (9:20−cr−00517−BHH−1)

Argued:  December 11, 2024                    Decided:  February 7, 2025

Before WILKINSON, GREGORY, and RICHARDSON, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Gregory and Judge Richardson joined.

**ARGUED:**   Kimberly Harvey Albro, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbia, South Carolina, for Appellant.  Andrea Gwen Hoffman, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee.  **ON BRIEF:**  Adair F. Boroughs, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee.

WILKINSON, Circuit Judge:

Rojay Lawson played a key role in a telemarketing sweepstakes scheme run out of Jamaica that victimized at least 179 people in the United States, most of whom were elderly. Based in South Carolina, he collected unlawful proceeds from victims, laundered them, took a cut for himself, and sent the rest to his co-conspirators in Jamaica. Lawson eventually pleaded guilty to 13 counts of wire fraud conspiracy, money laundering conspiracy, wire fraud, and mail fraud. He now raises various challenges to his sentence. He contests the application of a vulnerable victim enhancement, the denial of a minor role reduction, and the calculation of loss. Finding no error, we affirm.

I.

Between around 2016 and 2020, Rojay Lawson, his mother Theresa Lawson, and a group of co-conspirators carried out a telemarketing scam to defraud gullible Americans. Lawson's co-conspirators, who were based in Jamaica, pulled together "client lists" of largely elderly individuals in the United States and contacted at least 179 of them. The callers falsely informed victims that they had won a sweepstakes. They dangled prizes such as millions of dollars in cash, a new car, or a new TV. In order to claim these too-good-to-be-true winnings, victims were persuaded to first pay bogus "taxes and fees" of hundreds or thousands of dollars. The scammers in Jamaica instructed their marks to send these payments to an address in South Carolina through prepaid cards, money orders, personal checks, and wire transfers. J.A. 53–56, 136, 141, 151.

Victims across the country sent these payments to Lawson and his mother, who were originally from Jamaica and lived in South Carolina. Often the money was laundered

2

through various bank accounts, some fraudulently opened under victims' names. In total, Lawson and his mother had a direct hand in defrauding victims of at least $720,000. The Lawsons kept a percentage of these funds for themselves and, as mentioned, sent the rest of the money to their co-conspirators in Jamaica. The victims, of course, never received any prize winnings. J.A. 55–56, 137, 141–42, 151.

Of the 179 identified victims, over 70% were elderly (65 or older). Their ages ranged from 42 to 96, with an average age of 75. Many of them were tricked into sending the Lawsons thousands of dollars. Some were successfully preyed upon multiple times for additional money. A 91-year-old woman was scammed out of $27,000. An 85-year-old man was swindled out of $50,000. J.A. 136–37, 147, 150–51, 168–72.

In September 2020 Lawson and his mother were charged in a sixteen-count indictment in the District of South Carolina. Count 1 charged them with conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349 by devising a scheme to defraud "elderly persons in the United States" through the sweepstakes scam described above. Counts 2 through 8 alleged seven instances of substantive wire fraud in violation of 18 U.S.C. § 1343. Counts 9 through 15 alleged seven instances of substantive mail fraud in violation of 18 U.S.C. § 1341. Count 16 charged the Lawsons with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) by agreeing to conduct financial transactions to conceal the source of the unlawful proceeds. J.A. 23–28.

Lawson pleaded guilty at a hearing in February 2022 without a plea agreement. The prosecutor described the sweepstakes scheme and detailed Lawson's participation in collecting, laundering, and sending funds to Jamaica. She emphasized that the scam was

3

designed to "defraud elderly victims" and that Lawson "admitted" in a post-arrest interview "that he knew the client list consisted of elderly people." Lawson then agreed that "everything the prosecutor said [was] substantially true and correct," subject to one caveat: he maintained that he was not involved in the scheme until he arrived in the United States from Jamaica in October 2017. Lawson pleaded guilty to all Counts except Counts 2, 3, and 4, which involved three wires sent by victims to Theresa before Lawson's arrival in South Carolina. J.A. 26, 40, 53–59.

The probation office prepared a presentence report (PSR) for Lawson's sentencing. That report provided more information about the sweepstakes scheme, including details from victim interviews. It also calculated a loss amount. Based on a review of the Lawsons' bank and mail records, the PSR calculated "total actual loss attributed to defendants" to be $720,948. That total was the sum of two amounts. First, a chart attached to the PSR listed the 179 identified victims, their ages, and their individual loss amounts. The "actual loss" to these "known victims" was $405,401. Second, there was "additional actual loss that could not be attributed to specific victims" of $315,547, which came from a review of the Lawsons' bank accounts. The total actual loss was the sum of these two amounts, or $720,948. The PSR recommended that Lawson and his mother be responsible for paying the $405,401 that was attributed to specific victims as restitution. J.A. 151–52, 168–72.

As relevant to this appeal, the PSR made three determinations when calculating Lawson's offense level under the Guidelines. First, it applied a 14-level increase pursuant to U.S.S.G. § 2B1.1(b)(H) because the loss amount of $720,948 was more than $550,000 but less than $1,500,000. Second, the PSR applied a 2-level increase pursuant to U.S.S.G.

4

§ 3A1.1(b)(1) because Lawson knew or should have known that a victim of the offense was "vulnerable." Third, the PSR did not make any adjustments for Lawson's aggravating or mitigating "role in the offense" under U.S.S.G. §§ 3B1.1, 2. J.A. 152, 154–56.

Lawson objected to these determinations, and the PSR rejected his arguments in an addendum. First, Lawson objected to the loss amount to the extent that it included losses that occurred before October 2017. Lawson maintained that he did not join the sweepstakes conspiracy until he arrived in the United States and was therefore not responsible for victim losses occurring before then. Relying in part on post-arrest statements made by both Lawson and his mother, the PSR concluded by a preponderance of the evidence that Lawson joined the conspiracy in 2015 while attending high school in Jamaica and recruited his mother to join. Lawson "produced no affirmative evidence" to the contrary. Thus the PSR maintained that "Rojay Lawson and his mother were directly responsible for *at least* $720,948 in intended loss as part of their jointly undertaken criminal activity."[1] J.A. 177–78, 180–81.

Second, Lawson objected to the vulnerable victim enhancement. He argued that old age alone cannot make a victim vulnerable and that he "had no way of knowing" that the victims were vulnerable because he had no direct contact with them. The PSR referred Lawson to Application Note 2 of § 3A1.1, which defines a "vulnerable victim" as someone "who is unusually vulnerable *due to age*, physical or mental condition, or who is otherwise

---

[1] Under the same logic, probation rejected Lawson's analogous objection to the restitution amount of $405,401. J.A. 177–78, 181.

particularly susceptible to the criminal conduct." The report reiterated that the "scheme targeted 179 victims with an average age of 75" and cited cases upholding the enhancement where telemarketing scams victimized the elderly. As far as Lawson's knowledge, the PSR noted that Lawson had admitted in an interview with federal agents that he knew the scam targeted elderly victims. It also stated that Jamaican sweepstakes scams were widely known to target the elderly. Thus, "under a preponderance of the evidence standard, it is more likely than not the defendant knew or should have known the conspiracy was purposefully targeting and victimizing elderly victims" who were unusually vulnerable to this type of telemarketing scam. J.A. 183–85.

Third, Lawson argued that he served merely as a "conduit of the funds," was the "least culpable person in this conspiracy," and was therefore entitled to a 2-level reduction as a minor participant under U.S.S.G. § 3B1.2. Under a "totality of the circumstances" analysis, the PSR assessed five factors. Among other findings, it concluded that Lawson actively "collected, managed, stored, and laundered money stolen from victims," which "he sent back to coconspirators in Jamaica." He was also "fundamental and essential to the scheme," which "could not continue to operate" without his and his mother's management of the funds. Lawson was therefore an "average participant" in the scheme and ineligible for the minor role reduction. J.A. 185–87.

Lawson was sentenced at a hearing in January 2023. He made the same objections to his Guidelines calculations. The government reiterated responses similar to those noted in the PSR addendum. Relying on the government's proffer and the addendum, the court

6

overruled Lawson's objections to the loss amount, the vulnerable victim enhancement, and the denial of a minor role reduction. J.A. 81, 86, 89–90.

The court then heard from the government, Lawson's counsel, Lawson himself, and Lawson's girlfriend as to the recommended sentence and the § 3553(a) factors. The government argued for a Guidelines sentence, while Lawson requested a downward variance of probation. Before imposing a sentence, the court confirmed with probation that the "intended loss" was $720,948. The judge then acknowledged Lawson's "path of rehabilitation" on the one hand, and the "heinous" nature of the scheme, on the other. She emphasized that the "nature of the victims themselves is disturbing in their vulnerable stage, and relying on a lot of these funds to live on or for retirement." The "complex scheme" "took a great deal of skill and effort," so a Guidelines sentence was appropriate. The court sentenced Lawson to 78 months in prison, the same sentence that Lawson's mother had received a few months earlier. Lawson was ordered to pay $405,401 in restitution, jointly and severally with his mother. J.A. 91–105.

Lawson timely appealed his sentence. He argues that the district court erred in applying the vulnerable victim enhancement and in denying him the minor role reduction. Lawson also claims that the $720,948 loss amount was too high because it impermissibly commingled "intended" losses with "actual" losses. He contends that his sentence was both procedurally and substantively unreasonable.

## II.

We review a district court's sentencing decision "with deference, considering only whether the court abused the broad discretion afforded it." *United States v. Etoty*, 679 F.3d

292, 294 (4th Cir. 2012) (citing *Gall v. United States*, 552 U.S. 38 (2007)). With Guidelines calculations, we review legal conclusions *de novo* and factual findings for clear error. *Id.* The district court is free to "adopt the findings in a presentence report in order to sustain a particular sentencing decision." *United States v. Singh*, 54 F.3d 1182, 1192 (4th Cir. 1995).

### III.

### A.

Lawson challenges the district court's application of the vulnerable victim enhancement and its denial of a minor role reduction when calculating his Guidelines range. We assess both of these factual determinations for clear error. *See United States v. Shephard*, 892 F.3d 666, 670, 672 (4th Cir. 2018) (vulnerable victim); *United States v. Powell*, 680 F.3d 350, 359 (4th Cir. 2012) (minor role). We "will not reverse a lower court's finding of fact simply because we would have decided the case differently." *United States v. Span*, 789 F.3d 320, 325 (4th Cir. 2015) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)). Rather, "we can find clear error only if, on the entire evidence, we are left with the definite and firm conviction that a mistake has been committed." *United States v. Manigan*, 592 F.3d 621, 631 (4th Cir. 2010) (quoting *Easley*, 532 U.S. at 242).

### B.

There are good reasons why we apply this clear error standard and accord "due deference" to a district court's fact-intensive application of sentencing enhancements and reductions under the Sentencing Guidelines. *See United States v. Steffen*, 741 F.3d 411, 414 (4th Cir. 2013). Our colleagues on the district court are in a far better position than we are to assess the propriety of these adjustments for at least two reasons.

First, the district court is steeped in the case at hand. Presiding over hearings and interacting directly with the parties, witnesses, and probation, district judges are on "the front lines, sentencing flesh-and-blood defendants." *United States v. Diaz-Villafane*, 874 F.2d 43, 49–50 (1st Cir. 1989). A "[sentencing] judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." *Gall v. United States*, 552 U.S. 38, 51 (2007). The judge's intimate, on-the-ground observations provide insight into the gravity of the offense and the character of the defendant that appellate judges simply cannot glean from "the antiseptic nature of a sterile paper record." *Diaz-Villafane*, 874 F.2d at 49. That puts the sentencing judge "in a superior position to find facts and judge their import," *Gall*, 552 U.S. at 51, particularly with respect to determinations such as the vulnerability of a victim or the nature of the defendant's role in a complex scheme.

Second, these adjustments often require comparison to a baseline, and district courts draw on a wellspring of historical experience. Enhancements and reductions by their nature reflect some deviation from the norm. They add or subtract from a base offense level because of some unusual feature of the conduct or the defendant. But to determine whether a particular crime, offender, or victim is unusual or extraordinary, the judge must have a solid understanding of the ordinary. On this front, "[d]istrict courts have an institutional advantage over appellate courts" because "they see so many more Guidelines cases than appellate courts do." *Koon v. United States*, 518 U.S. 81, 98 (1996). From the daily grist of the sentencing mill emerges a "special competence" to evaluate the "ordinariness or

9

unusualness of a particular case." *Id.* at 99 (quoting *United States v. Rivera*, 994 F.2d 942, 951 (1st Cir. 1993)).

In short, district courts simply have a better yardstick than we do. The combination of intimate knowledge of the facts and breadth of sentencing experience makes district court judges best positioned to evaluate enhancements and reductions to Guidelines sentences. The two adjustments here were classic matters for the district court, and we will not casually disturb its findings.

C.

The vulnerable victim enhancement applies when "the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). Its application "requires a fact-based explanation" of (1) "why advanced age or some other characteristic made one or more victims unusually vulnerable to the offense conduct" and (2) "why the defendant knew or should have known of this unusual vulnerability." *Shephard*, 892 F.3d at 670 (quoting *United States v. Llamas*, 599 F.3d 381, 388 (4th Cir. 2010)). The district court did not err in applying this enhancement.

Lawson first challenges his enhancement under prong one. He argues that old age alone cannot make a victim vulnerable and that the district court erroneously relied on the mere fact that the victims were elderly when it enhanced his sentence.

We agree with Lawson that courts should not "apply a blanket assumption that an advanced age is sufficient to render a victim vulnerable" and thus that not every crime committed against an older person should automatically be enhanced. *United States v. Vega-Iturrino*, 565 F.3d 430, 434 (8th Cir. 2009). But old age is plainly a characteristic

10

that can make a victim vulnerable to certain types of crime. Indeed the Sentencing Commission tells us so. Application Note 2 of the Guidelines provision explains that a "vulnerable victim" is one "who is unusually vulnerable *due to age*, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 cmt. n.2 (emphasis added); *see also Llamas*, 599 F.3d at 388. Thus, a victim's advanced age may trigger the enhancement, but there must be some link between age and susceptibility to the criminal conduct.

Common sense confirms that link existed here. The elderly victims were vulnerable in the particular *context* of a telemarketing scheme that dangled potentially life-changing prize winnings. Elderly individuals often live alone, with children out of the house and a spouse who has passed away. They may suffer from cognitive decline and the other natural infirmities that come with advancing years. Many elderly folks live on a fixed income like Social Security and have limited retirement savings. All of these characteristics make elderly victims especially susceptible to a scam like this one. They may lack the strength, stamina, and acuity to resist a crafty con man. More so than the average person, they may be overwhelmed by the temptation of some new appliance or car, or overly trusting of a purportedly official representative calling them on the phone.

And because they are particularly susceptible to telemarketing fraud, "the elderly are a frequent target of scammers and frequently qualify as vulnerable victims." *United States v. Iriri*, 825 F.3d 351, 352 (7th Cir. 2016). That is why courts are "entitled to infer that [elderly] victims were targeted due to their age-related vulnerability" in the context of this "Jamaican lottery scam." *United States v. Sterling*, 701 F. App'x 196, 199, 208 (4th

11

Cir. 2017). As the PSR observed, a simple Google search reveals that the "Jamaican Lottery Scam is widely and publicly known to purposefully target the elderly citizens of the United States." J.A. 184. In fact, out of all fraudulent schemes, "prize, sweepstakes, and lottery scams" generate the "highest aggregate reported losses" among adults 80 and over, with almost $50 million in annual losses. FEDERAL TRADE COMMISSION, PROTECTING OLDER CONSUMERS 2023–2024, at 22–23. We are "especially disinclined to regard the district court's reasoned conclusion as clearly erroneous when common sense illustrates how the victim[s'] vulnerability made [them] 'particularly susceptible to the criminal conduct.'" *Etoty*, 679 F.3d at 295.

The facts of this case confirm that intuition, and the court correctly identified the link between old age and vulnerability to telemarketing fraud. To start, Lawson pleaded guilty to targeting the elderly. J.A. 24, 55–56, 58–59. The government reiterated at sentencing that the scheme targeted elderly victims and that a great many of the 179 identified victims were 80 and older. J.A. 83. It underscored that the enhancement was warranted because elderly victims were "more susceptible because of their age" to a "telemarketing scam." J.A. 82–83. And the court found that the "goal" of the sweepstakes conspiracy was to contact "elderly people." J.A. 86. An illustrative example involved an 83-year-old victim. She received multiple phone calls from the scammers and was tricked into sending hundreds of dollars on several occasions, all with the promise of a cash award. Relying on a "fixed income," she was unable "to pay her rent or bills as a result of the fraud." She later told investigators "she was lonely and that hearing a friendly voice on the telephone convinced her to send the money." J.A. 147.

12

This scheme further involved the odious practice of "reloading." Reloading in a "telemarketing sweepstakes conspiracy" entails "targeting people who have already fallen victim to the scheme at least once." *Shephard*, 892 F.3d at 670. We have reasoned that the tactic of reloading creates a "strong inference" that the defendants targeted the victims "because they are unusually vulnerable" and that the vulnerable victim enhancement should apply. *Id.* at 672 n.3. Here, Count 1 of the indictment alleged that the schemers "contacted" the "elderly victims" "*numerous* times with requests for bogus fees and/or taxes," and the "process continued for as long as the victims could be persuaded to send *additional* money." J.A. 25–26 (emphasis added). The PSR also detailed the reloading of several victims. J.A. 142–49.

As regards prong two, we are satisfied that Lawson knew the victims were elderly and vulnerable. He pleaded guilty to Count 1 which alleged the targeting of elderly victims. J.A. 23–26. And at his plea colloquy, Lawson agreed that he was "involved in a scheme to defraud elderly victims" and that he had "admitted" that he knew the callers targeted older people. J.A. 55–56, 58.

The government additionally highlighted Lawson's post-arrest interview where he "indicated that he knew that scammers were calling these elderly victims," that the "client lists" contained the "names, addresses and phone numbers of elderly Americans," and that "while he was in Jamaica, he witnessed scammers calling victims and he knew that they were elderly because that's the way that scammers talked about the clients." J.A. 82, 184. The judge concluded that "the fact that he did plead specifically to language admitting that . . . elderly people . . . were the goal of the conspiracy to contact, in effect, shows that he

13

had knowledge. He certainly had knowledge. That's what he admitted to under oath. And he also should have known anyway." J.A. 86. The district court "sufficiently explain[ed] its decision" as to both prongs, *Shephard*, 892 F.3d at 672, and we affirm its application of the vulnerable victim enhancement.

D.

We next address the denial of a minor participant reduction. A defendant is eligible for an offense level reduction if he was "substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2 & cmt. 3(A); *see United States v. Carbajal*, 717 F. App'x 234, 241 (4th Cir. 2018). A "minimal participant" is "among the least culpable of those involved" and may receive a 4-level reduction. U.S.S.G. § 3B1.2(a) & cmt. 4. A "minor participant" is "less culpable than most other participants in the criminal activity" but more so than a minimal participant and may receive a 2-level reduction. *Id.* § 3B1.2(b) & cmt. 5. This fact-based determination is based on "the totality of the circumstances," and the Guidelines identify five relevant factors: "the defendant's understanding of the criminal activity, the defendant's role in planning it, the degree to which the defendant made decisions, the extent of the defendant's participation, and the benefit the defendant stood to gain." *United States v. Guerrero-Deleon*, 713 F. App'x 163, 165 (4th Cir. 2017) (citing U.S.S.G. § 3B1.2 cmt. 3(C)). "The defendant bears the burden of proving, by a preponderance of the evidence, that he is entitled" to the reduction. *Powell*, 680 F.3d at 358–59.

The court adopted the PSR's analysis of the Guidelines' five factors. It assessed that Lawson (1) "clearly understood the scope and structure of the criminal activity" because

14

he "engaged in recruiting members" into the scheme, "collected, managed, stored, and laundered money stolen from victims" and "sent money back to coconspirators in Jamaica, so that the scheme could continue"; (2) "managed the proceeds," "organized and managed the bank accounts," and "launder[ed] the stolen money"; (3) "exercised decision making authority as it pertained to his own conduct"; (4) played a "fundamental and essential" role in the scheme; and (5) "stood to directly benefit" as he and his mother "kept '10 to 20 percent' of the proceeds." J.A. 186–87. Relying on this analysis and on Lawson's "own admission to facts at the guilty plea," the court denied a minor role reduction. J.A. 89–90.

Lawson argues on appeal that the PSR "listed the correct factors" but "misapplied and misinterpreted them" in two ways. First, he claims that the "guidelines counsel against considering" whether a defendant played an "indispensable role" in the scheme and that the district court erred by adopting an analysis that considered Lawson's "fundamental and essential" role. Opening Brief at 24–25.

Lawson misreads the Guidelines and our case law. The Guidelines advise that whether "a defendant performs an essential or indispensable role in the criminal activity is *not determinative*. Such a defendant may receive [the adjustment] if he or she is *substantially less culpable* than the average participant in the criminal activity." U.S.S.G. § 3B1.2 cmt. 3(C) (emphasis added). The Guidelines, however, do not "counsel against considering" a defendant's indispensable role. Rather, as we explained in *United States v. Carbajal*, the Commission added this language in 2015 because some courts had been denying the minor role adjustment "solely because" the defendant was "integral" or "indispensable" to the offense. *Carbajal*, 717 F. App'x at 240. While not dispositive,

15

indispensability continues to be a valid and important "factor to be considered in the broader Section 3B1.2 calculus." *Guerrero-Deleon*, 713 F. App'x at 166. Because the district court did not treat Lawson's "fundamental and essential" role as dispositive, there was no error.

Lawson also argues that the district court failed to appreciate the narrowness of his responsibilities in the scheme as compared to his co-conspirators in Jamaica. He argues that he was a mere "conduit of funds" similar to a "drug courier" and portrays his involvement as a "passive role where he simply accepted the money that Jamaican co-conspirators defrauded from victims and sent the money to the co-conspirators when directed to do so." Opening Brief at 24–26.

Even if that characterization of the facts were accurate, it does not render Lawson anything less than an average participant. Lawson was not a minor participant simply because he received directions or because the organizers in Jamaica may have played aggravating roles. *See United States v. Daughtrey*, 874 F.2d 213, 216–217, 219 (4th Cir. 1989).

The fraudulent scheme here, like many others, operated in sequential and necessary steps, including solicitation, collection, and laundering. Just because Lawson was involved only in the second and third steps but not in the initial outreach to victims did not make him a minor participant. The conspiracy as a whole depended upon the success of each and every stage of the scheme, and Lawson played a meaningful role in two of the three steps. In fact, being a mere "conduit of funds" is an important and highly culpable role in a *money laundering conspiracy*. That is why he was paid a significant 10–20% cut of the proceeds

16

he collected and laundered. Participation in only a subset of the conspiracy did not render Lawson substantially less culpable than his co-conspirators. *See Guerrero-Deleon*, 713 F. App'x at 166 (holding that courier collecting 5% transaction fee in a drug conspiracy was not entitled to minor role reduction). By Lawson's logic, the mendacious callers—because they were involved in only the solicitation stage of the scheme—would also be minor participants, leaving only the conspiracy's leadership as "average participants." But that would defy the plain meaning of "average," and the exception would swallow the rule.

Ultimately, the focus is on Lawson's culpability. *See* U.S.S.G. § 3B1.2 & cmt. 3(A); *United States v. White*, 875 F.2d 427, 433–34 (4th Cir. 1989). And we agree with the district court that Lawson failed to prove that he was substantially less culpable than the average participant in the sweepstakes conspiracy when he was actively engaged in collecting, moving around, and concealing the unlawful proceeds. The court's denial of the minor role reduction was sensible and certainly not clearly erroneous.

## IV.

### A.

Lawson next challenges the court's calculation of loss. We typically review that calculation for clear error. *United States v. Jones*, 716 F.3d 851, 859–60 (4th Cir. 2013). But "when a party does not preserve an argument in the district court, we review only for plain error." *United States v. Lynn*, 592 F.3d 572, 577 (4th Cir. 2010). To preserve an issue, the defendant must "alert the district court to the specific reason" for the objection. *United States v. Bennett*, 698 F.3d 194, 199 (4th Cir. 2012). In other words, the defendant must

17

ask us "to evaluate the same fundamental question" as he asked the district court. *United States v. Boyd*, 5 F.4th 550, 556 (4th Cir. 2021).

Lawson argues that the court miscalculated the loss amount by combining "intended" losses with "actual" losses. But he did not preserve this issue. Although he did object to the loss amount at sentencing, Lawson did so for a completely different reason, namely to contest the inclusion of losses that occurred before his arrival in the United States. He never raised the issue of "actual" versus "intended" loss. Because he did not raise this specific issue to the district court, we will review for plain error. To prevail, Lawson "must show (1) that the trial court erred, (2) that the error is clear and obvious, and (3) that the error affected his substantial rights." *United States v. Fowler*, 948 F.3d 663, 669 (4th Cir. 2020). If he makes those three showings, "it is within our discretion to correct the error," and "we should exercise this discretion only if 'the error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). Because we find no error in the calculation of loss, we affirm.

## B.

As a species of "nonviolent" crime, fraud is sometimes thought less serious than a violent offense. But this overlooks the pain of misbegotten trust in others that fraud has the unique capacity to inflict. The law seeks to condemn this betrayal monetarily, and in a scheme to defraud like this one, the Guidelines provide for offense level adjustments that increase with the amount of "loss." *See* U.S.S.G. § 2B1.1(b)(1). "Loss" is defined as "the greater of actual loss or intended loss." *Id.* § 2B1.1 cmt. 3(A); *see also United States v.*

18

*Boler*, 115 F.4th 316, 328–29 (4th Cir. 2024). Actual loss is the "reasonably foreseeable pecuniary harm" that actually "resulted from the offense," while intended loss is the "pecuniary harm that the defendant purposely sought to inflict" including what was intended but not actualized. *See* U.S.S.G. § 2B1.1 cmt. 3(A).[2] "The government must establish the amount of loss by a preponderance of evidence. But the court need only make a reasonable estimate of the loss." *Shephard*, 892 F.3d at 673.

The PSR detailed an investigation of the Lawsons' bank and mail records that identified actual losses suffered by the scheme's victims. As described earlier, the PSR concluded that Lawson and his mother were jointly responsible for two sets of *actual* loss: $405,401 in "actual loss to known victims" and $315,547 in "additional actual loss that could not be attributed to specific victims." That yielded $720,948 in "total actual loss attributed to defendants," for which Lawson's offense level was increased by 14 levels. J.A. 154–55, 172. Elsewhere the PSR found that Lawson and his mother were "directly responsible for *at least* $720,948 in intended loss as part of their jointly undertaken criminal activity during their participation in the conspiracy." J.A. 151. Before announcing Lawson's sentence, the judge clarified with probation whether the "intended loss" was $720,948, to which probation responded, "Yes." J.A. 101.

Lawson now claims that the loss amount was too high. He sees that the Guidelines distinguish between actual loss and intended loss and then assumes that actual and intended

---

[2] In November 2024, the Sentencing Commission moved these definitions of "loss" from the commentary "into the Guidelines' text." *See Boler*, 115 F.4th at 327 n.6.

19

losses are categorically different and mutually exclusive. In his view, a loss amount is either actual *or* "merely intended." Opening Brief at 12–14. He suspects that because the PSR and the district court referred to the $720,948 loss amount as both "actual" and "intended," the loss amount impermissibly lumped together actual and intended losses instead of using only the greater of the two. In other words, he believes that part of the $720,948 was actual loss and part was intended loss, resulting in an inflated loss amount.

Lawson is mistaken. Actual and intended losses are not mutually exclusive. In fact, a loss amount is very often *both* actual and intended. A foreseeable loss amount that was suffered by the victim is actual loss. If that amount of actual loss was *intended* by the defendant, it is *also* intended loss. Actual and intended loss are different in two cases. First, a defendant may be responsible for intended but *unsuccessful* loss; this loss would be intended but not actual, so intended loss would be the greater of the two. *See, e.g.*, *Boler*, 115 F.4th at 321 (intended loss greater than actual loss where defendant submitted "six fraudulent tax return refunds" but the "IRS did not pay two of the claimed refunds"). That scenario does not apply here because all of the $720,948 were funds actually sent to the Lawsons by victims.

Second, a defendant may be responsible for *un*intended but actualized loss; this loss would be actual but not intended, so actual loss would be the greater of the two. *See, e.g.*, *United States v. Roggy*, 76 F.3d 189, 193 (8th Cir. 1996) (actual loss greater than intended loss where defendant intended to defraud company by using an alternative, cheaper pesticide and unintentionally caused extensive damage to crops). That scenario also does not apply here because there is no evidence or claim that any of the $720,948 in actual loss

20

was accidental or that Lawson received more money than he set out to get, as made clear by his admissions at the plea colloquy and as conceded in oral argument. *See* Oral Arg. at 39:25–39:36 ("Whatever came to them is what they expected to get.").

Thus, it was permissible and accurate for the PSR and the district court to use the terms "actual" and "intended" *interchangeably* to describe the $720,948 loss amount, because that amount was, in its entirety, both actual (it was incurred by the victims) and intended (Lawson admitted at his plea hearing that he and his co-conspirators purposefully sought to defraud the elderly victims of this money). The greater of actual and intended loss here was the same, namely $720,948, which was intended actual loss. Because the loss amount was properly calculated, there was no error, and we affirm.[3]

Lawson lobs in one final argument, also for the first time on appeal, concerning the $315,547 portion of the actual loss that was not attributed to identified victims. In an aside in his brief, Lawson argues that it is "unclear" whether this loss amount was proven by a preponderance of the evidence. Opening Brief at 13. The PSR calculated this amount based on tracing transfers into the "fraudulent bank accounts" created by the Lawsons for this scheme. J.A. 151–52; Oral Arg. at 28:35–28:55, 31:20–31:45. Lawson had "'an affirmative duty' to show 'that the information in the presentence report [was] unreliable, and articulate the reasons why the facts contained therein [were] untrue or inaccurate.'" *United States v. Mondragon*, 860 F.3d 227, 233 (4th Cir. 2017) (quoting *United States v. Terry*, 916 F.2d

---

[3] And the court did not abuse its discretion by ordering restitution of $405,401 because that amount was actual loss by identified victims. *See United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017).

157, 162 (4th Cir. 1990)). He has offered no legitimate reason why over $300,000 was deposited into bank accounts he used to collect and launder money stolen from the victims. The district court was therefore free to adopt the PSR's findings of fact. *See id.*

V.

Lawson challenges his sentence as procedurally and substantively unreasonable. We first assess "whether the district court committed a significant procedural error, such as improperly calculating the Guidelines range, failing to consider the § 3553(a) factors, or failing to adequately explain the chosen sentence." *United States v. Arbaugh*, 951 F.3d 167, 172 (4th Cir. 2020) (quoting *Gall*, 552 U.S. at 51). We then turn to substantive reasonableness and consider whether the court "abused its discretion in concluding that the sentence it chose satisfied the standards set forth in § 3553(a)." *Id.* at 176. Because the court did not abuse its considerable sentencing discretion, we again affirm.

On procedural reasonableness, Lawson makes one primary claim. He argues that the Guidelines calculation was incorrect because of the court's errors in applying the vulnerable victim enhancement, denying the minor role reduction, and calculating the loss amount. We have held that none of these determinations was erroneous and see no error in the Guidelines calculation. Because the district court properly followed the rest of the steps in sentencing Lawson, his sentence was procedurally reasonable.

We turn to substantive reasonableness. Lawson's Guidelines range was 63 to 78 months. J.A. 91. The court considered all of the § 3553(a) factors, examining the nature of the offense and the character of the defendant, emphasizing the "seriousness" and "heinous" nature of the crime, and underscoring the importance of both specific and

22

general deterrence. J.A. 101–03. It also stated, referring to § 3553(a)(6), that the court "seeks to avoid disparity between similarly situated defendants, and I think that he is exactly in line with his co-defendant here in this case." J.A. 103. The court then imposed a within-Guidelines sentence of 66 months plus 12 months under 18 U.S.C. § 2326, which was triggered by the elderly victims, for a total of 78 months. *Id.* Lawson's mother and co-defendant had previously received the same 78-month sentence. J.A. 93. After Lawson's sentencing, his mother was re-sentenced to 46 months because of a "confusing statement" made at her initial sentencing. Reply Brief at 11–12. Lawson argues that his sentence is now unreasonably high because of this newly created disparity.

Lawson focuses on the wrong kind of disparity. A "sentence is not 'unreasonable under § 3553(a)(6) merely because it creates a disparity with a co-defendant's sentence.'" *United States v. Gillespie*, 27 F.4th 934, 945 (4th Cir. 2022) (quoting *United States v. Pyles*, 482 F.3d 282, 290 (4th Cir. 2007)). Rather, our cases have explained that § 3553(a)(6)'s primary purpose is to fulfill the "Guidelines' goal" "to eliminate unwarranted sentencing disparities *nationwide*." *United States v. Withers*, 100 F.3d 1142, 1149 (4th Cir. 1996) (emphasis added). Lawson offers no evidence that his sentence was out of line with nationwide sentences. His mother's sentence reduction did nothing to undermine the fact that the Guidelines have taken a proper measure of Lawson's individual misconduct. We are satisfied that the district court evaluated Lawson's conduct under all of the § 3553(a) factors and based its sentence on that individualized assessment. The court determined that "the guideline range" reflected "the seriousness of what happened, which was very serious and very painful for these victims." J.A. 103. We therefore conclude that Lawson has failed

23

to rebut the oft-stated presumption that his within-Guidelines sentence is a reasonable one. *See Arbaugh*, 951 F.3d at 176 (citing *Rita v. United States*, 551 U.S. 338 (2007)).

VI.

Lawson played an active and important role in a reprehensible scheme that preyed upon vulnerable elderly victims. The district court made considered factual findings at sentencing, and Lawson "has given us no reason to abandon our traditional deference" to those findings. *Etoty*, 679 F.3d at 295. Finding no error, we affirm the district court in all respects.

*AFFIRMED*